Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that defendant's motion for partial summary judgment be and is granted in part and denied in part.

IT IS FURTHER ORDERED that defendant's motion for partial summary judgment on plaintiff's claim for breach of the Missouri franchise statute, Count III, be and is denied.

IT IS FURTHER ORDERED that defendant's motion for partial summary judgment on plaintiff's claim for breach of fiduciary duty, Count VII, be and is granted.

Roland M. **LOVVORN**, Richard Jarvis and Michael S. Kennedy, on their behalf and behalf of all others similarly situated, Plaintiffs,

v.

The **CITY OF CHATTANOOGA, TENNESSEE**; Gene Roberts, Individually and as the Mayor of the City of Chattanooga, Tennessee; Thomas Kennedy, Paul Clark, James Eberle and John Franklin, Individually and as Commissioners for the City of Chattanooga, Tennessee; and Jerry W. Evans, Individually and as the Chief of the Fire Department of the City of Chattanooga, Tennessee, Defendants.

No. CIV–1–86–389.

United States District Court, E.D. Tennessee, S.D.

Nov. 13, 1986.

Thomas A. Woodley, Erick J. Genser, Gregory K. McGillivary, Mulholland & Hickey, Washington, D.C., Jerry H. Summers, Summers & McCrea, Chattanooga, Tenn., for plaintiffs.

Eugene N. Collins, Randall L. Nelson, Chattanooga, Tenn., for defendants.

## MEMORANDUM

EDGAR, District Judge.

This action is brought by three fire fighters employed by the City of Chattanooga,

against the City, the members of the City's Board of Commissioners, and the Chief of the City's Fire Department. Plaintiffs seek injunctive and declaratory relief under 42 U.S.C. §§ 1983 and 1988, various amendments to the Constitution of the United States including the fourth and fourteenth, and 28 U.S.C. §§ 2201 and 2202. Plaintiffs have sought to have this case certified as a class action under Federal Rule of Civil Procedure 23. However, since all parties have conceded that class action certification will not further any important purpose in this litigation, the Court finds it unnecessary to rule on plaintiffs' certification request. The case will not, therefore, proceed as a class action.

The Chattanooga Fire Department has notified all of its personnel that they will soon be subjected to a urinalysis test for drugs. Plaintiffs ask that these tests be enjoined and that this Court enter a declaratory judgment that the proposed tests are unconstitutional.

FACTS:

A recitation of some recent history is here necessary. In 1983, Tom Kennedy was elected as Commissioner of Fire and Police for the City of Chattanooga. In this position, he is responsible for running the Chattanooga Fire and Police Departments, subject to the overall supervision of a five-member Board of Commissioners, of which he is a member. The Chattanooga Fire Department includes not only fire fighting personnel but personnel who provide emergency medical services to the City as well. In early 1984, some "civilian" employees of either the Police or Fire Department were "caught or almost caught" smoking marijuana and were appropriately disciplined. Apparently as a result of this, Commissioner Kennedy, along with Police Chief Gene

McCutcheon and then Fire Chief A.O. Powell, decided to administer urine tests for marijuana to all members of the Chattanooga Fire and Police Departments.[1] Word that this was going to occur was put out through the "grapevine" but formal notice of the testing was not given until shortly before the testing was to begin. On April 16, 1985, then Fire Chief A.O. Powell sent a memorandum to all fire fighters advising that while on duty they were to report to Allied Clinical Laboratories, an independent laboratory, for blood testing beginning April 22, 1985. In late April and early May 1985, groups of fire fighters were taken to Allied Labs and were required to give both blood and urine samples.[2] Commissioner Kennedy had "information" that one or more firemen to be tested were carrying clean urine samples in balloons in their pants. Therefore, some of the initial donors were "patted down" in an effort to determine if they were carrying anything which could result in a switched or an adulterated urine sample. Except for fifteen or less donors, all urine samples were given by the firemen under the direct observation of a Deputy or Assistant Fire Chief. Allied Laboratories subjected the samples to the enzyme multiple immunoassay technique (EMIT) test, which on the average is about ninety-five percent accurate.[3] All uniformed fire fighters were tested. The urine tests were mandatory. One fire fighter was terminated for refusing to submit to the test.

None of the methods for testing, nor any of the standards for analyzing the urine specimens, nor any procedures for implementation of discipline and release of testing information were ever put in writing.

---

1. Police Chief McCutcheon in case CIV–1–86–417, a related case brought by police officers challenging the testing in the Chattanooga Police Department, testified that there were other factors which entered into the decision to administer tests to the Police Department.

2. Plaintiffs make no complaint about the blood tests. It is unclear what, if anything, the City did with the results of those tests.

3. The accuracy of EMIT tests has been discussed in other cases. *See Peranzo v. Coughlin,* 608 F.Supp. 1504, 1509–14 (S.D.N.Y.1985); *Wykoff v. Resig,* 613 F.Supp. 1504, 1508–12 (N.D.Ind. 1985); *Higgs v. Wilson,* 616 F.Supp. 226, 231–2 (W.D.Ky.1985); *Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986).

There is some confusion as to the precise test result that triggered disciplinary action. Urine testing 100 nanograms of cannaboids (ng) per milliliter (ml) or more was considered positive. Urine testing from 50 to 100 ng/ml was considered "trace." Urine testing from 20 to 50 ng/ml was considered "minus trace." All fire fighters testing at minus trace or above, *e.g.*, over 20 ng/ml, were retested.

Those fire fighters with two positive EMIT tests were then suspended from their jobs, informed of the test results, and given a hearing before Chief Powell. Their names were released to the press at the time of their suspension. The suspended fire fighters were informed of the charge against them, and at the hearing before Chief Powell they were permitted to make whatever explanation they could of the test results. These fire fighters were cited for disobeying Chattanooga Fire Department Rules and Regulations § 38, General Conduct, 38.11 which states:

> No member shall report for, or be on duty under the influence of any intoxicating liquors, drugs or compounds, nor shall he absent himself from duty, or render himself unfit to fully perform his duties for reasons, attributable to, or produced by indulgence in intoxicants.

Commissioner Kennedy disciplined these fire fighters based on Powell's recommendation. The discipline included probation, suspension, demotion in rank, or termination depending upon the numerical level of test results and the rank of the fire fighter.

As a result of the May tests, and after some additional tests in August and September 1985, ten employees were terminated by the City, five resigned, and seventeen were placed on probation. Fire fighters who tested trace or minus trace were put on probation and subjected to future unannounced drug screens. A number of the terminated fire fighters took advantage of their right under a City ordinance for a post-termination hearing before the full Chattanooga City Commission. The Commission upheld the terminations. Several of these fire fighters have taken their cases, pursuant to state law, to the Chancery Court of Hamilton County, Tennessee where the cases will be reviewed on the record.

After the May testing was complete and most of the discipline administered, Commissioner Kennedy decided to have the positive EMIT tests confirmed by Compu-chem Laboratories, in Raleigh, North Carolina. Compu-chem performed gas chromotography/mass spectrometry (GCMS) tests on the samples. These tests, which are virtually one hundred percent accurate,[4] apparently confirmed the results of the earlier administrated EMIT tests.

Several of the fire fighters who were terminated in 1985 participated in a drug rehabilitation program at Valley Psychiatric Hospital. That treatment was covered by the City's health insurance program. A number of these employees have been rehired and are subject to unannounced urine retests.

Because one of the rehired fire fighters again tested positive, and because Commissioner Kennedy was told by one or more of the fire fighters who were disciplined in 1985 that some fire fighters in 1985 had switched urine samples, Commissioner Kennedy in the summer of 1986 decided to give mandatory urine tests to the entire Fire Department once again. These tests would not be limited to those fifteen or less fire fighters who gave unobserved samples in 1985, but would again encompass the entire Fire Department. The Commissioner has not conducted any kind of conventional investigation of drug use in the Chattanooga Fire Department nor has there been any objective indication that the performance of any member of the department, or the department as a whole, has been affected by the use of drugs.

---

4. Expert testimony established this test as the most accurate available. *See also Brotherhood of Maintenance of Way Employees, Lodge 16 v.* *Burlington Northern R.R. Co.,* 802 F.2d 1016 (8th Cir.1986).

As stated above, there are no written procedures or standards for the proposed tests. The parties have stipulated that the proposed tests will be performed in substantially the same manner as they were in 1985. However, Commissioner Kennedy now states that a 50 nanogram (ng) per milliliter (ml) standard will be used as a "bright line" test for passing or failing, and that there will be no trace or minus trace categories. It is not clear whether GCMS test confirmation would be obtained prior to the administration of any discipline.

It is the proposed 1986 testing that forms the basis of this lawsuit.

DISCUSSION:

A. *Fourth Amendment*

The fourth amendment to the United States Constitution states in its entirety:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The fourth amendment prohibits unreasonable searches and seizures by the states by virtue of the fourteenth amendment. This includes municipalities and municipal officials. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

The fourth amendment protects people, not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Since a blood test is subject to fourth amendment constraints, *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966), it seems clear that a urine test likewise amounts to a search and seizure from a person within the fourth amendment. *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.1986); *McDonell v. Hunter*, 612 F.Supp. 1122 (S.D. Iowa 1985); *Allen v. City of Marietta*, 601 F.Supp. 482 (N.D.Ga.1985). The

parties in this case do not disagree on this point.

The fourth amendment, however, proscribes only unreasonable searches and seizures. The determination of reasonableness requires a balancing of the need to search against the invasion of the individual which the search entails. *New Jersey v. T.L.O.*, 469 U.S. 325, 336, 105 S.Ct. 733, 740, 83 L.Ed.2d 720, 731 (1985). The Supreme Court has said that:

The test of reasonableness under the fourth amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

There can be no doubt that the City here has a compelling interest in having its fire fighters free from drugs. Fighting fires is hazardous work. Fire fighters must be able to make snap decisions and to react quickly. Fighting fires at some locations is pre-planned and fire fighters must be able to recall such things as the location of water sources and of hazardous chemicals. The City is primarily interested in testing for marijuana use. Expert testimony established that depending upon various factors, marijuana can adversely affect one's perception, decision-making time, short-term memory, and motor skills.

Balanced against this is the extent of the invasion of the individual by the kind of urine testing proposed by the City. Before an individual may invoke the protections of the fourth amendment, the individual must have a reasonable or legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 739, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979). The determinants here are (1) whether the individual subjectively expects privacy; and (2) whether the individual's subjective expectation of priva-

cy is one which society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580; *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516.

This inquiry entails a rather subjective evaluation of the intrusiveness of the urine test itself. At least one court has found the urine test to involve a high degree of bodily intrusion. *Capua v. The City of Plainfield,* 643 F.Supp. 1507, 1516 (D.N.J. 1986). The rationale here is that human dignity and privacy are adversely affected where, as under the Chattanooga testing procedure, an individual is forced to engage in a private bodily function in the presence of a government agent. *Id.* at 1517. Other courts have not found the urine tests to be so intrusive. *Shoemaker v. Handel,* 619 F.Supp. 1089, 1101 (D.N.J.1985), *aff'd* 795 F.2d 1136 (3d Cir.1986). *Mack v. United States,* No. 85 Civ. 5764, slip op. at 6 (S.D.N.Y. April 21, 1986). The City argues in this case that fire fighters who live in the same quarters and routinely undress in each other's presence and use common restroom facilities should not as a rule be offended by exposing themselves in the act of urination in the presence of another of the same sex.

■ The Court suspects that the degree of intrusion engendered by a urine test will vary greatly depending upon the individual being tested. Some persons may not mind it at all, while others, including plaintiffs in this case, may take great offense. This Court concludes that most people, including fire fighters, have a certain degree of subjective expectation of privacy in the act of urination. *See McDonell v. Hunter,* 612 F.Supp. at 1127. The Chattanooga testing procedure does, therefore, interfere to

some degree with the fire fighters' subjective expectation of privacy.[5]

Having made this determination, the Court turns to the second prong of the *Katz-Smith* test to consider whether the fire fighters' expectation of privacy is one that society is prepared to recognize as reasonable under the circumstances of the proposed Chattanooga tests. Ordinarily the security of the person is protected against official intrusion by an objective standard which requires "probable cause" for search and seizure. *See Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). However, consistent with the fourth amendment, "the community may legitimately demand that the individual give up some part of his or her interest in privacy and security to advance the community's vital interests in law enforcement." *Winston v. Lee,* 470 U.S. 753, 759, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662, 668 (1985).

While Chattanooga fire fighters do not entirely surrender their fourth amendment rights when they become City employees, they nevertheless as employees, as opposed to the general citizenry, have a somewhat diminished expectation of privacy.[6] *Allen v. City of Marietta,* 601 F.Supp. 482 (N.D. Ga.1985); *Turner v. Fraternal Order of Police,* 500 A.2d 1005 (D.C.App.1985); *Mack v. United States,* No. 85 Civ. 5764, slip op. at 7. While probable cause would not be required for the City to conduct urine tests, the balancing of the interests of the City and the individual requires some quantum of individualized suspicion before the tests can be carried out. This quantum may be denoted as "reasonable suspicion."

**5.** The observation of fire fighters making donations of urine samples certainly contributes to the intrusiveness of the tests. However, defendants have shown that there is no less intrusive means of conducting the tests that insures the integrity of the urine sample. Therefore, observation of the donation does not, by itself, make these urine tests constitutionally infirm.

**6.** In view of the ultimate disposition of this case, the Court finds it unnecessary to rule on plain-

tiffs' contention that the release of positive test results to the press prior to the pre-termination hearings violates an unconstitutional invasion of their "right to privacy." It does not appear that the release of such information was done in 1985 pursuant to any particular policy. Perhaps the City will insure that disclosure of the results of any future tests will await the dispensation of discipline.

All courts which have ruled upon the validity of urine tests for public employees, including police officers and firemen, have required as a prerequisite some articulable basis for suspecting that the employee was using illegal drugs, usually framed as "reasonable suspicion." *Capua v. The City of Plainfield*, 643 F.Supp. 1507, 1524 (D.N.J. 1986) (fire fighters); *City of Palm Bay v. Bauman*, 475 So.2d 1322 (Fla.App. 5 Dist. 1985) (police officers and fire fighters); *Turner v. Fraternal Order of Police*, 500 A.2d 1005 (D.C.App.1985) (police officers); *McDonell v. Hunter*, 612 F.Supp. 1122 (S.D.Iowa 1985) (correctional officers); *Allen v. City of Marietta*, 601 F.Supp. 482 (N.D.Ga.1985) (employees of City Board of Lights and Water working around high voltage electric wires); *Patchogue-Medford Congress of Teachers v. Board of Education*, 505 N.Y.S.2d 888 (N.Y.App.Div. 1986) (teachers); *Jones v. McKenzie*, 628 F.Supp. 1500 (D.D.C.1986) (school bus drivers); *Caruso v. Ward*, 506 N.Y.S.2d 789 (N.Y.Sup.Ct.1986) (police officers in special organized crime control bureau).

In effect, the City asks this Court to carve out an exception to the requirement of even reasonable suspicion for City fire fighters, an exception akin to that sometimes permitted for administrative searches in closely regulated industries. *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir. 1986); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). However, in the administrative search cases, the courts have relied on other safeguards to protect the individual's expectation of privacy. *Delaware v. Prouse*, 440 U.S. 648, 655, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Among these safeguards are clearly defined standards for the searches and mechanisms for alleviating privacy concerns. *Donovan v. Dewey*, 452 U.S. 594, 604, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981). Moreover, absent such safeguards, even administrative searches may not be carried out without a warrant obtained by a showing of some modicum of cause. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

Such clearly defined standards are lacking in this case. No standards for the frequency, purpose, or methods of conducting the tests have been established by Chattanooga's City Commission.[7] Neither have such firm standards been established by Commissioner Kennedy himself. In 1985, some donations of urine samples were observed and some were not. Some fire fighters were "patted down," others were not. Various pass/fail standards were used, and these standards have been changed by the Commissioner for the proposed testing. It is unclear what the disciplinary penalties are to be for what test results. Discipline apparently varied in some degree at least with respect to the amount of marijuana detected by the test and the rank of the fire fighter involved. It is unclear whether the EMIT tests are to be confirmed by GCMS tests. In short, the administration of these tests is subject to the sort of standardless discretion which, even if the administrative search exception did otherwise apply, would make it inapplicable in this case.

---

7. Chattanooga City Ordinance 8012, section 2–536 provides that any employee of the Department of Fire and Police covered by the Firemen's and Policemen's Insurance and Pension Fund must submit to a physical exam at least once every 36 months. Section 2–533 provides that a City employee may be required to take a physical exam if a supervisor is of the opinion that the employee is incapacitated for work on account of mental or physical illness, condition or injury. The provisions of this ordinance are not the subject of this litigation.

However, there would seem to be no constitutional difficulty with the regularly conducted physicals or the requested physicals, or a pre-employment physical, even if they involve a urinalysis for drugs, provided that they are not used as a subterfuge to conduct an unreasonable search and seizure. *See Turner v. Fraternal Order of Police*, 500 A.2d 1005, 1011 (D.C.App. 1985); *McDonnel v. Hunter*, 612 F.Supp. 122, 130 n. 6 (D.Iowa 1986); *Caruso v. Ward*, 506 N.Y.S.2d 789, 797 (Sup.Ct.N.Y. July 1, 1986). One of the primary complaints of the plaintiffs is that the urine tests stigmatize them and require them to "prove their innocence." The taking of a physical exam, something we all do (or should do) on occasion, would not have this effect.

The defendants, characterizing the Fire Department as a "paramilitary organization," attempt to analogize this case to those instances where it has been determined that members of the Armed Forces have been properly subjected to urine tests for drugs without a warrant. However, it is to be noted that this was done only upon a finding that, *inter alia*, "the increased incidence of drug abuse in the Armed Forces poses a substantial threat to the readiness and efficiency of our military forces." *Committee For G.I. Rights v. Callaway*, 518 F.2d 466, 476 (D.C.Cir.1975). On the evidence which this Court has before it, it cannot be concluded that there is an increased incidence of drug abuse in the Fire Department that poses a substantial threat to the readiness and efficiency of that department. Additionally, there is a difference between a fireman's expectation of privacy and that of a soldier who is subjected to military inspections from the first day at boot camp. *Id.* at 477. Finally, military tests are conducted pursuant to specific regulations and standards that the City does not have. *See Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983). The military "exception" to a requirement of reasonable suspicion does not apply to this case.

Two questions must be answered before a search may be found "reasonable":

> First, one must consider 'whether the ... action was justified at its inception,' ... second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justify the interference in the first place,'....

*New Jersey v. T.L.O.*, 469 U.S. at 340, 105 S.Ct. at 743, 83 L.Ed.2d at 734.

■ A urine test would be justified at its inception when there are reasonable grounds for suspecting that the test will turn up evidence that the fire fighter is using illegal drugs. *New Jersey v. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 744, 83 L.Ed.2d at 735. In the absence of safeguards to insure that the tests are not subject to the standardless discretion of Chattanooga fire officials, this suspicion must be an individualized suspicion, *New Jersey v. T.L.O.*, at 341, 105 S.Ct. at 744, 83 L.Ed.2d at 735 n. 8, and linked in some way with objective facts as opposed to an inarticulate hunch. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

The facts of this case do not, at present, allow this Court to find reasonable suspicion for the City to conduct its proposed 1986 tests. Based upon evidence adduced at the trial, Commissioner Kennedy knows only that several fire fighters tested positive in the 1985 tests. He has also been told by some of the fire fighters who have since been through drug rehabilitation treatment that "some" fire fighters had switched samples in the 1985 tests. The City has not pointed to any objective facts concerning deficient job performance or physical or mental deficiencies on the part of its fire fighters, either in general or with respect to specific personnel, which might lead to a reasonable suspicion upon which tests could be based. The parties have stipulated that the proposed tests would *not* be limited to those individual employees for whom the defendants have reasonable cause or suspicion to believe are using controlled substances.

As stated above, the scope of the search, and the measures adopted must be reasonably related to its objectives and not excessively intrusive. *New Jersey v. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 744, 83 L.Ed.2d 720, 735. If the City had objective facts indicating drug usage by those 15 or so fire fighters who, according to one or more anonymous tipsters, substituted urine samples at the 1985 tests, such might be reasonable cause to test those 15 or so fire fighters. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). However, to test the entire Fire Department on that information would be beyond the permissible scope of such tests.

The City need not rely on mass drug testing to detect drug usage by members of the Chattanooga Fire Department. If indeed the use of drugs is causing deficient performance on the part of fire fighters, this should be detectable to a considerable extent by properly designed personnel procedures to detect such drug abuse symptoms as absenteeism, aberrant conduct and financial difficulties. It does not appear that the City has expended any effort on this approach.

It could be possible that a fire fighter on drugs may escape detection for awhile and maybe injure himself or someone else, although there is no evidence before this Court that this has ever happened. However, there is certainly no guarantee that even mass urine testing would prevent such an occurrence. If a reasonable suspicion requirement were to have this result, it would be one of the prices that we have to pay for the greater good of living under the protection of the Constitution.

### B. Fourteenth Amendment—Due Process

Section 1 of the fourteenth amendment to the United States Constitution provides in part that no state shall "deprive any person of life, liberty or property without due process of law."

Plaintiff fire fighters have a property right or interest in their jobs which activates the requirement that they be accorded due process by the City. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). They also have a liberty right in their reputation, on or in integrity which may not be taken without due process. *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707.

Due process requires that fire fighters be provided with a hearing prior to termination or otherwise discipline. *Loudermill*, 470 U.S. at 542–43, 105 S.Ct. at 1493–94, 84 L.Ed.2d at 503–4; *McMurphy v. City of Flushing*, 802 F.2d 191, (6th Cir.1986). Due process entitles each fire fighter to oral or written notice of the charges against them, an explanation of the evidence, and an opportunity to present his or her side of the story. *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495, 84 L.Ed.2d at 506. In 1985, the fire fighters were give a pre-termination hearing before the Chief of the Chattanooga Fire Department. In addition, they were given extensive post-termination hearings before the full City Commission. State law also gives fire fighters an opportunity to appeal from the decision of the City Commission by writ of certiorari to the state courts where the case is reviewed on the record. In short, the procedural framework for review of testing results and the administration of discipline is in full accord with due process.

### C. Conclusion

The tests which the City proposes at this time to administer to all Chattanooga fire fighters would violate the fire fighters' rights under the fourth amendment. This is not to say, however, that the City is foreclosed from testing fire fighters for drugs. The City may conduct such tests if it has a reasonable suspicion to do so; the scope of the tests is related to the objective engendered by the reasonable suspicion; and the intrusiveness of the tests is minimized to the extent it can be without jeopardizing the integrity of the tests.

An appropriate judgment will enter.

### JUDGMENT

For the reasons expressed by the Court in its memorandum filed herewith, it is the JUDGMENT of the Court that the department-wide drug tests of Chattanooga fire fighters originally proposed by the defendants to begin on October 1, 1986, would violate the fourth amendment to the Constitution of the United States. The defendants, their agents and employees are hereby ENJOINED from conducting urine testing of fire fighting personnel except in accordance with the terms of the memorandum filed herewith.

The plaintiffs shall recover of the defendants their costs of action.