Terry SMITH, Plaintiff,

v.

Steven A. WHITE, individually and as Manager, TVA Nuclear Power; Norman Zigrossi, individually and as Inspector General, TVA; H.D. Elkins, individually and as Manager, Instrument Maintenance; Brad Bonnell, Dewayne Broome, and Joe O'Rourke, individually and as agents or employees of OIG, TVA, Defendants.

Lebron RAKESTRAW, Robert Sands, Andrea Smith, Terry Smith, Donna Green, Allan Waddell, Mark K. Witt, Annie Kitchens, Elizabeth Hartley, John Lawrence, and Public Safety and Security Employees Union, Plaintiffs,

v.

Steven A. WHITE, individually and as Manager, TVA Nuclear Power; Norman Zigrossi, individually and as Inspector General, TVA; and John W. Thompson, individually and as Manager of Corporate Services, TVA; Brad Bonnell, Al Millard, Toyette Rathbone, Dewayne Broome, Joe O'Rourke, Charlie Devlin, Robert Allen, Laura Mantooth, Jim Smith, Andy Derryberry, and Fred Vichich, individually and as agents or employees of OIG, TVA, Defendants.

Civ. Nos. 1–87–187, 1–87–193.

United States District Court, E.D. Tennessee, S.D.

Aug. 11, 1987.

Charles P. DuPree, Michael E. Richardson, Chattanooga, Tenn., for plaintiffs.

Edward S. Christenbury, General Counsel, James E. Fox, Deputy General Counsel, Justin M. Schwamm, Sr., Asst. General Counsel, Thomas F. Fine, Philip J. Pfeifer, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

## MEMORANDUM

EDGAR, District Judge.

### I.

Plaintiffs are employees of the Tennessee Valley Authority ("TVA"), an agency of the United States Government. They are joined as plaintiffs by the Public Safety and Security Employees Union which represents some of the plaintiffs in collective bargaining with TVA. The defendants are Steven A. White, currently TVA's Director of Nuclear Power; John W. Thompson, Manager of Corporate Services for TVA; Norman Zigrossi, TVA's Inspector General; and various other TVA employees who are special agents of TVA's Office of the Inspector General ("OIG").

Plaintiffs, with the exception of the Union, seek damages for alleged violations of their constitutional rights as a consequence of drug testing carried out by the defendants in April 1987, and resulting disciplinary action which was taken against some of the plaintiffs. All plaintiffs request injunctive relief against further drug testing.

The individual plaintiffs are employed by TVA at its Sequoyah Nuclear Plant ("Sequoyah" or the "plant") located just north of Chattanooga, Tennessee. Sequoyah, while currently not in actual operation, is designed to generate electric power through the use of heat generated by a nuclear reaction.

Plaintiffs Robert Sands, Allan Waddell, Andrea Smith, Lebron Rakestraw and Donna Green, are public safety officers at Sequoyah. These plaintiffs are responsible for the security of Sequoyah. They carry semi-automatic weapons and control access to the secure area of the plant. It is part of their duty to protect Sequoyah from sabotage or other harm from outside sources. They check persons entering the secure area of the plant for weapons, explosives and illegal drugs. Plaintiff Mark Witt is an assistant unit operator, one of the most critical positions at Sequoyah. Plaintiff Terry Smith is an instrument mechanic who installs and maintains security and safety systems at Sequoyah. Plaintiff John Lawrence is an electrician who also works on those systems. Plaintiffs Elizabeth Hartley and Annie Kitchens are laborers. All of the plaintiffs have security clearances which allow them unescorted access to all secure areas of Sequoyah.

TVA is required by the Nuclear Regulatory Commission to have procedures to provide reasonable assurance that those employees with access to vital areas are fit for duty in the sense that they are free from abuse of alcohol and drugs. *See Rushton v. Nebraska Public Power Dist.,* 653 F.Supp. 1510, 1514 (D.Neb.1987).

In early April 1987, TVA officials were advised that a Lieutenant Daniel, a TVA public safety officer, was undergoing treatment for drug abuse. Lieutenant Daniel was questioned by personnel from OIG. Initial interrogations of Daniel revealed no information about drug use at Sequoyah other than his own. Daniel was then given a polygraph test which revealed deception. After this, Daniel provided TVA with information regarding drug usage and distribution by specific TVA employees at Sequoyah.[1] The OIG questioners, Brad Bonnell

---

**1.** As it turned out, 58% of the employees named by Daniel tested positive for either marijuana or cocaine.

and Mark Hughes, both of whom are experienced law enforcement officers, confirmed the accuracy of some of the information provided by Daniel with local law enforcement agencies. Bonnell and Hughes were both convinced for various reasons that Daniel, after having been administered the polygraph test, was telling the truth.

TVA's Inspector General, Norman Zigrossi, consulted with James Hall, legal counsel to the OIG, and was advised that TVA had enough "reasonable suspicion" to acquire urine samples from various individuals whose names had surfaced in the questioning of Lieutenant Daniel. Messrs. Zigrossi, Hall and others then met with Steven White, TVA's Manager of Nuclear Power. White satisfied himself after questioning Zigrossi and his legal counsel that there was reasonable suspicion to test the plaintiffs and a number of other TVA employees. White was also told that illegal drugs had been found in a secure area at Watts Bar Nuclear Plant, about 30 miles away from Sequoyah. A similar meeting was held between OIG personnel and John W. Thompson, TVA's Manager of Corporate Services. Both White and Thompson signed a memorandum dated April 17, 1987, directed to each of the employees about which they had information at that time. The memorandum read as follows:

The Office of the Inspector General (OIG) is currently investigating the allegations that a number of TVA employees at Sequoyah Nuclear Plant (SQN) are using, selling, or possessing illegal drugs.

The OIG has obtained information which creates a reasonable suspicion you have used, sold, or possessed illegal drugs. This information is set forth in the attachment to this memorandum.

You are hereby directed to *immediately* consent to and provide the necessary urine specimen for analysis to determine the possible presence of drugs in your

system. The failure to consent, to provide the necessary specimen, or to achieve an acceptable result on the drug screening test may result in adverse administrative action.

In order for a drug screen test to be conducted immediately, you are directed to accompany the OIG investigators to the appropriate Division of Medical Services office and provide a urine specimen for testing. The test results will be kept confidential and provided only to those TVA managers and other government officials who need to know the results. The test results will also be provided to OIG personnel who have a need to know of unlawful drug use by SQN employees in connection with the ongoing investigation.

Later, as information was developed concerning other individuals, Mr. White signed identical memoranda directed to them. Attached to these memoranda was a short statement advising the employee generally of the information which TVA had concerning the employee's involvement with drugs.

The information which TVA acquired as to each of the plaintiffs was as follows:

*Donna Green*—Lieutenant Daniel had seen her under the influence of a drug at an off-duty function. She had asked Daniel about the availability of cocaine.[2]

*Lebron Rakestraw*—Mr. Rakestraw had told Daniel that he had lost a business because of his cocaine use and that he had grown marijuana.[3] Rakestraw had told Daniel that he had taken a substance called "gold seal" to mask the effect of drugs in his urine prior to undergoing previous drug screens at TVA.

*Andrea Smith*—Daniel had observed her on the job when Daniel thought that she was under the influence of cocaine. She knew the same cocaine supplier that Daniel knew—a supplier who would not deal in quantities of less than three and

---

2. Donna Green later told OIG investigators that she had used marijuana until about 1984.

3. Lebron Rakestraw later told OIG investigators that he had used marijuana while employed by

TVA; that he had used cocaine before his employment at TVA; and that his wife grew marijuana.

one-half grams of cocaine (an "eight-ball").

*Terry Smith*—Had told Daniel that he was afraid of a drug test.

*Allan Waddell*—Had discussed his use of illegal drugs with Daniel.[4]

*Annie Kitchens*—Daniel advised that this employee was a supplier and user of cocaine "by reputation."[5]

*Elizabeth Hartley*—Annie Kitchens told OIG that she had smoked pot with Hartley and knew that another employee had purchased marijuana from Hartley at the plant site.[6]

*John Lawrence*—Annie Kitchens advised OIG that Lawrence, who rode to work with Kitchens, had told her her about his use of cocaine. Rakestraw also told OIG that Lawrence advised him (Rakestraw) that a lot of money could be made selling drugs at Sequoyah.

*Mark Witt*—An informant, who had nothing to gain from making an adverse comment about Witt, told Charles Fox, TVA Deputy Manager of Nuclear Power, that Witt had expressed concern about when drug tests would be carried out so that he would have time to "clean up his act."

*Robert Sands*—Allan Waddell had told Daniel that Sands had discussed with Waddell his (Sands) use of and trafficking in cocaine.

All of the OIG personnel involved in this investigation, most of whom are defendants in this action, are experienced law enforcement personnel. Many are former agents of the Federal Bureau of Investigation. At all times they were working pursuant to instructions provided them by Mr. Zigrossi and their legal counsel. Working in teams of two, they were instructed to contact the plaintiffs and other employees about whom legal counsel and Messrs. White and/or Thompson had made a reasonable suspicion determination. Initially, it was anticipated that all of the employees would be contacted at work. However, when it was learned that some of the employees, including some of the plaintiffs, were working shifts which would have them at home at the designated time for the investigation, Mr. Zigrossi, with the advice of counsel, authorized OIG agents to contact the employees at home during TVA business hours. It was important that the investigation be launched as to all suspected employees simultaneously to help ensure an accurate urinalysis.

OIG investigators were told to advise the employees that this was a civil, not a criminal, investigation. They were to question the employee about his or her drug involvement and about knowledge of other drug activities at Sequoyah. They were then to ask the employee for a urine sample. If the employee refused to give the sample, they were to hand that employee the White/Thompson memorandum.

As it turned out, it was necessary to use the memorandum in some instances. In other instances it was not. With the exception of plaintiff Robert Sands, all plaintiffs provided urine samples to OIG. Some of the samples were taken at restrooms in the TVA facilities where the interviews were conducted. In those instances where the interviews were conducted at the employees' homes, the samples were, for the sake of convenience, given there. Stephen White and Norman Zigrossi testified that they thought that this practice was permissible within the terms of their instructions, even though the White/Thompson memorandum mentioned that the tests would be given at a division of the TVA Medical Services office. At the time the urine samples were collected, no plaintiff particularly objected to giving the sample at home, although some were reluctant to give the sample at all. An OIG investigator of the same sex as the employee witnessed the donation of the sample in order to guaran-

---

**4.** Allan Waddell later admitted to using marijuana the night before he submitted to the urinalysis.

**5.** Annie Kitchens later admitted to OIG agents that she had used cocaine on one occasion.

**6.** OIG investigators found Hartley's husband, also a TVA employee, under the influence of marijuana when they called their home. Elizabeth Hartley later admitted to having used marijuana in the immediate past.

tee the integrity of the sample. Of the plaintiffs, only Mark Witt gave an unwitnessed sample. The samples were then immediately sealed, labeled and taken to an independent laboratory for testing. The OIG investigators in all important respects followed the instructions that they were given by their supervisors and by legal counsel.

As a result of the tests, plaintiffs Elizabeth Hartley, Allan Waddell and Annie Kitchens tested positive for marijuana. Plaintiff Terry Smith tested positive for both marijuana and amphetamines. The test results were confirmed by one or more additional tests. The security clearances of each of these employees was suspended upon receipt of the test results. All of these employees were then suspended from their jobs and were told that they were to contact TVA's employee assistance program. Eventually each of them did. Plaintiffs Waddell, Kitchens and Hartley have undergone, or are undergoing, various counselling and treatment programs, and are awaiting reassignment by TVA. Terry Smith was evaluated as an alcoholic but has refused treatment or counselling. He remains suspended without pay.

Plaintiff Rakestraw tested negative, but was suspended because it was learned that he had materially falsified his employment application. Robert Sands was suspended for refusing to submit to the urinalysis. These employees are currently suspended without pay pending a final determination of their status.

Plaintiffs Andrea Smith, Donna Green, John Lawrence and Mark Witt tested negative and remain employed by TVA in their original jobs.

## II.

It is now clear that a urinalysis is a search and seizure within the meaning of the Fourth Amendment. *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *National Treasury Employees Union v.*

*Von Raab*, 816 F.2d 170, 176 (5th Cir.1987); *Lovvorn v. City of Chattanooga*, 647 F.Supp. 875, 879 (E.D.Tenn.1986). The Fourth Amendment proscribes only *unreasonable* searches and seizures. Whether a search is unreasonable depends on the context within which it takes place. *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985). In the case of searches conducted by a public employer, a determination of reasonableness requires a balancing of the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the workplace. *O'Connor v. Ortega*, —— U.S. ——, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714, 724 (1987).

The balancing process requires a determination as to whether the urinalyses were justified at their inception. The governmental interest in having a drug free work force to protect and operate the most vital areas of a nuclear power plant is patently obvious. This Court and others have held that drug urinalyses may be conducted when there is "reasonable suspicion." *See Lovvorn v. City of Chattanooga*, 647 F.Supp. at 881; *National Treasury Employees Union*, 816 F.2d at 117. The Court rejects plaintiffs' contention that the defendants could not have had "reasonable suspicion" with respect to any of them unless actual observed behavior indicated that their job performance was influenced by drugs. Reasonable suspicion is a lesser standard than probable cause. There is reasonable suspicion when there is some articulable basis for suspecting that the employee is using illegal drugs. *Lovvorn*, 647 F.Supp. at 881. Put another way, there is reasonable suspicion when there is some quantum of individualized suspicion as opposed to an inarticulate hunch.[7] *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *Lovvorn*, 647

---

7. The Supreme Court in *O'Connor v. Ortega*, —— U.S. ——, ——, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714, 727 (1987), may have left open the question of whether the suspicion must be "individual-

ized." This is not an issue in the case at bar, however, because TVA's suspicion was individualized.

F.Supp. at 882. Reasonable suspicion may be based on statements made by other employees and tips from informants. Even probable cause can be based on informants' tips when the totality of the circumstances indicates a fair probability of accuracy. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In this case, the defendants had no reason to doubt the statements of Lieutenant Daniel and other employees. The defendants even checked out part of the information obtained from Daniel insofar as it was possible to do so without compromising the secrecy of this investigation. The information which TVA officials had formed an ample basis for their conclusion that they had reasonable suspicion to test the plaintiffs.

■ The balancing test also requires a determination as to whether the measures adopted to conduct the urinalyses were reasonably related to the objectives of the tests and not excessively intrusive. *O'Connor v. Ortega,* —— U.S. at ——, 107 S.Ct. at 1503, 94 L.Ed.2d at 729. The donations of the urine samples were, for the most part, witnessed by OIG investigators. The investigators were not obnoxious about it. They merely were present in the various bathrooms when the donations were made. The defendants maintain that this procedure was necessary to insure the integrity of the tests. The plaintiffs have presented no evidence to the contrary. The observation of the urine donations does not make the urine tests constitutionally infirm. *Lovvorn,* 647 F.Supp. at 880 n. 5.

The home visits were likewise not excessively intrusive. They were necessary in the case of some of the plaintiffs (Sands, Waddell, Green) because they were not on the job at the time that TVA wanted to conduct its surprise test to prevent the plaintiffs from avoiding or delaying the tests.

In summary, this Court finds that the search of the plaintiffs was reasonable in both its inception and its scope. There was here no violation of the Fourth Amendment.

### III.

■ The plaintiffs, without citation of authority, assert that the defendants' activities violated their constitutional rights to privacy. Presumably the plaintiffs mean those penumbral personal privacy rights recognized in such cases as *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). It should be noted here that the OIG investigators did take care during their investigation to insure that other persons were not made aware that the plaintiffs were the targets of a drug investigation. So, in that sense, the privacy of the plaintiffs was protected by TVA. It is by no means clear that a non consensual urinalysis is an infringement upon constitutional privacy rights. However, even if it is, those rights are subject to limitation by countervailing state interests. *Roe v. Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973); *National Treasury Employees Union v. Von Raab,* 816 F.2d at 181. The Court concludes that any privacy interests the plaintiffs may have had here are outweighed by the governmental need to insure a drug free security force at a nuclear power plant.

### IV.

■ Even if this Court were to find that the Fourth Amendment had been violated by the defendants, it must nevertheless be concluded that each of the named defendants is entitled to qualified immunity under the standard outlined in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Drug testing of government employees is a relatively new phenomenon. Its constitutional contours are only now being outlined in the courts. One cannot say that the law on this subject was clearly established at the time these defendants conducted this investigation. They operated only with considered legal advice based upon those legal precedents available at the time, including the decision of this Court in *Lovvorn.* As this Court has now determined, the defendants' actions were consistent with the Fourth Amendment. In any event, it cannot be

said that their action violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. *See also Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

### V.

■ Those plaintiffs who were suspended claim that they have a property interest in their jobs and that they were deprived of this interest without due process by being suspended without a hearing. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *McMurphy v. City of Flushing,* 802 F.2d 191 (6th Cir.1986). TVA responds that 16 U.S.C. § 831b, a portion of the TVA Act, deprives plaintiffs of any property interest in their jobs. It is unnecessary for the Court to decide that point, however, because it is clear that none of the named defendants had any role in denying a presuspension hearing to any of the plaintiffs. TVA itself is not a defendant in this action. The plaintiffs' due process contention must, therefore, of necessity fail in this case.

### VI.

The Court's disposition of this case makes it unnecessary to rule on TVA's motion to reconsider the Court's earlier ruling that the plaintiffs were not here required, in pursuing their constitutional claims, to exhaust their contractual and administrative remedies under various collective bargaining agreements and with the Merit Systems Protection Board. The plaintiffs are, of course, free to pursue those remedies if they so desire.

An appropriate judgment will enter.

### JUDGMENT

These consolidated actions came on for trial before the Court. The issues having been duly tried, and for the reasons set forth in the Court's memorandum filed herewith, it is ORDERED that the plaintiffs in this cause are DENIED any monetary or injunctive relief, and that these actions are hereby DISMISSED. Costs are awarded to the defendants.

SO ORDERED.