David BAILEY, Plaintiff,

v.

CITY OF BAYTOWN, TEXAS, et al., Defendants.

Civ. A. No. H–88–1035.

United States District Court, S.D. Texas, Houston Division.

Sept. 3, 1991.

Henry N. Burgin, Houston, Tex., for plaintiff.

Barry Abrams, Sewell & Riggs, Houston, Tex., for defendants.

## MEMORANDUM AND OPINION

RAINEY, Justice.

On the 5th day of September, 1990, the Defendants' Motion for Summary Judgment came on for hearing before this Court. The Defendants' Motion for Summary Judgment, Memorandum in Support of Motion for Summary Judgment, exhibits and related documentation are contained in those Docket Items Numbered 7, 8, 9, 18, 19, 23 and 26. The Plaintiff's response, Memorandum in Opposition to the Motion for Summary Judgment, and supplemental responses are contained in those Docket Items Numbered 11, 22 and 25. The Motions for Summary Judgment will be addressed in two separate sections.

First, this Court finds that the Defendants Motion for Summary Judgment, as to all Plaintiff's causes of action against Defendants Hutto, Simmons, Fuller, Phillips, Johnson, Pruett, and Embry, should be granted based on the Plaintiff's consent. (See Footnote # 2 of Docket Item # 22)

Second, this Court finds that Defendants' Motion for Summary Judgment on all Plaintiff's federal, constitutional and Title 42 U.S.C. § 1983 causes of action against all defendants should be granted.

Third, this Court finds that the Defendants' Motion for Summary Judgment on Plaintiff's state causes of action should also be granted.

The reasons for the above rulings are more fully explained below.

## FACTUAL BACKGROUND

The Plaintiff, David Bailey, was a licensed waste water operator working for the City of Baytown at its waste water treatment plant. On or about November 10, 1987 the Plaintiff was asked to run some errands in a city vehicle by his supervisor at the waste water treatment plant. The Supervisor, Wanna Dennis, was required to use the truck for an additional errand a few minutes after the Plaintiff's return. After returning from her errand the supervisor reported to her superiors that when she went to get in the truck, it smelled like marijuana.

Ms. Davis' superiors then asked the Plaintiff to produce a urine specimen for chemical analysis on the basis of the city's drug testing policy. The Plaintiff initially refused to provide the requested urine specimen. After going home, the Plaintiff decided to cooperate with the collection of the urine specimen and was taken to Dr. Riser's office for a medical collection of the specimen.

A specimen was collected that appeared, to Dr. Riser, to be diluted with tap water. The doctor then requested that a second specimen be provided. The Plaintiff was unable to provide the second specimen at that time and asked to be taken home again. Plaintiff offered to produce an additional urine specimen the following morning; however, the city declined to accept the offer and terminated the Plaintiff's employment.

The Plaintiff's termination was appealed through the city's employment appeal process. The termination was affirmed on appeal and this law suit followed.

## THE PLAINTIFF'S CLAIMS

The Plaintiff's original complaint lists nine separate causes of action. Each will be addressed in turn.

*Cause of Action # 1*—The City of Baytown's drug testing policy is unconstitutional on its face because it allows supervisors to require city employees to submit to a search of their person without probable cause to believe that the employee has violated any rule or law. The Plaintiff contends that the city's drug testing policy violates the 4th and 14th Amendments of the United States Constitution and Article 1, Section 9 of the Texas Constitution which guarantees a right of privacy to the Plaintiff.

*Cause of Action # 2*—The Plaintiff claims that the city's policy authorizing

drug testing is violative of the United States Constitution because it allows the city supervisors to require an employee to submit to drug testing without a probable cause determination made by a neutral magistrate prior to the testing. Plaintiff claims that this violates the Plaintiff's right to be free from unreasonable searches and seizures as guaranteed by the 4th Amendment of the United States Constitution and that it also violates the Plaintiff's right to not be deprived of liberty or property without due process of law as guaranteed by the 14th Amendment of the United States Constitution. Plaintiff further claims that both the 4th Amendment and the 14th Amendment rights claimed are also protected by independent state constitutional provisions.

*Cause of Action #3*—The Plaintiff claims that requiring a urine test under the facts of this case was an unreasonable search and seizure because the demand for the test was not based on probable cause or reasonable suspicion. Plaintiff claims that a search under these circumstances denied him his 4th and 14th Amendment rights under the United States Constitution and parallel rights granted by the Texas Constitution.

*Cause of Action #4*—Plaintiff claims that because the testing requested could not prove anything relevant to the alleged infraction requiring the Plaintiff to submit to a urine test under the facts of this case deprived him of his right to be free from unreasonable searches and seizures. Plaintiff claims that the requiring of an intrusive test for no logical reason violates the Plaintiff's rights under the 4th and 14th Amendments of the United States Constitution and parallel Texas Constitutional guarantees.

*Cause of Action #5*—Plaintiff claims that the Defendants' rejection of the original urine sample provided and refusal to allow the Plaintiff to return for a second sample the following morning, in conformity with the city's policy, was a violation of the Plaintiff's right to due process of law. Plaintiff claims that this violates both the federal and state constitutions.

*Cause of Action #6*—Plaintiff claims that the requirement that he undress for a physical examination by the doctor and the collection of the urine specimen without legal right constituted a trespass on his person.

*Cause of Action #7*—The Plaintiff contends that the Defendants intentionally and unlawfully caused the Plaintiff to suffer emotional distress by requiring him to submit to their "outrageous demand that he strip naked and produce a urine sample." Plaintiff claims that under the common law of Texas Defendants are liable to him in tort.

*Cause of Action #8*—The Plaintiff claims that the Defendants conspired together under color of law to violate the Plaintiff's constitutional rights as pled in each of the actions above.

*Cause of Action #9*—Plaintiff claims a cause of action under Title 42 U.S.C. § 1983 for the violations by the Defendants of the United States Constitution and the Constitution and common law of the State of Texas.

In addressing the claims presented by the Plaintiff, this Court will review the federal claims and then the pendent state law claims. Although the federal claims are divided under several different causes of action, the basic premise of the Plaintiff's federal complaint is that the city's drug testing policy fails to conform with the limitations imposed by the 4th and 14th Amendments of the United States Constitution. The Plaintiff then alleges that a Title 42 U.S.C. § 1983 violation has occurred based on the city supervisor's ordering of the drug testing in compliance with city policy. Finally, the Plaintiff alleges that the conduct of the city supervisors in this situation and the city drug testing policy in its entirety, both violate the Texas Constitutional limitations imposed on government conduct and the common law rights of the Plaintiff.

## THE FEDERAL CLAIMS

Although the Plaintiff's case was filed prior to the United States Supreme Court's

ruling in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), these two recent decisions are the controlling authority within which the Plaintiff's claims must be analyzed. In *Skinner*, the Court stated "the government's interest in regulating the conduct of railroad employees to insure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, 'likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements.'" *Skinner*, 109 S.Ct. at 1414, *quoting Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *Von Raab*, 109 S.Ct. at 1390, *also quoting Griffin.*

■ The Plaintiff's place of employment and the interests of the City of Baytown fall within two of the categories expressly enumerated by the Court in *Skinner*. First, the city's interest involves the operation of a "regulated industr[y]," waste water treatment. Second, the City's waste water treatment employees work in a "government office," where the safety of the employee, his or her coworkers, and the general public are the motivating concerns not law enforcement. Obviously, the "special needs" analysis used in *Griffin* and reaffirmed in *Skinner* and *Von Raab* must be applied to the Plaintiff's causes of action.

The *Skinner* Court held that the Fourth Amendment does not prohibit all searches and seizures, but only those that are unreasonable. The Court required that all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself be examined to determine reasonableness. *Skinner*, 109 S.Ct. at 1414. The standard established as to what will be considered a permissible practice "is judged by balancing its [the practices] intrusion on the individual's Fourth Amendment interest against its [the practices] promotion of legitimate governmental interests." *Skin-*

*ner*, at 1414 *quoting Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

■ The case at bar clearly parallels the *Skinner* decision. The Plaintiff's own deposition admits that he handles hazardous chemicals, drives public vehicles, and at times, oversees the operation of the waste water treatment plant without supervision at least during overtime shifts when he is covering for other people. Clearly, the dangers to his co-workers, the public safety, and the possibility of substantial volumes of toxic chemicals being injected into the water places the city's interests on a footing of equal gravity with that of the Federal Railroad Administration in *Skinner*. As in *Skinner*, the governmental interest in insuring the safety of the public and the employees themselves plainly justifies prohibiting covered employees from using alcohol or drugs while on duty. *Skinner*, 109 S.Ct. at 1415.

■ The *Skinner* Court expressly stated "that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." In *Skinner*, the Court held that in cases where the privacy interest implicated are minimal and an important governmental interest is furthered by the intrusive search, and that important governmental interest might not be protectable if individualized suspicion were required, a search may be reasonable despite the absence of individualized suspicion. The Court went on to find that the Federal Railroad Administration's regulations were, in fact, minimal intrusions into the individual's privacy even though blood tests, urine tests and breath tests were required of the covered employees without any individualized suspicion.

■ The Plaintiff has made several challenges to the city's drug testing policies. In the first cause of action the Plaintiff alleges that the city supervisors must show probable cause to believe that an individual employee has violated some city work rule or the law before drug testing can be required. The *Von Raab* Court stated that "the traditional probable-cause standard may be unhelpful in analyzing the reason-

ableness of routine administrative functions." *Von Raab*, 109 S.Ct. at 1391. The Court went on to hold; "Our precedents have settled that, in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Von Raab* at 1392. Clearly, the *Skinner* Court has held that probable cause is not the constitutional requirement for job related drug testing. In the Plaintiff's second cause of action, he alleges that probable cause must be determined before a neutral magistrate before urine testing can be conducted. The *Skinner* holding absolutely refutes this standard.

The Plaintiff's third cause of action alleges that either probable cause or reasonable suspicion are required before drug testing can be conducted. The requirement for probable cause and reasonable suspicion have both been eliminated by the *Skinner* decision under the circumstances in this case. However, the city's conduct in this matter was actually justified even if reasonable suspicion was the standard which should be applied. First, a reasonable suspicion exists when there is *some articulable basis* for suspecting that the employee is using illegal drugs. *Smith v. White*, 666 F.Supp. 1085, 1089 (E.D.Tenn.1987) (emphasis added). Furthermore, the *Smith* Court held that reasonable suspicion does not require "actual observed behavior indicat[ing] that their [the employee's] job performance was influenced by drugs."

■ This Court finds, as a matter of law, that the Plaintiff has failed to present any evidence that any reasonable juror could use to conclude that the city lacked "reasonable suspicion" to require David Bailey to submit to urinalysis. An "articulable basis" for suspecting that the Plaintiff had used illegal drugs existed when Ms. Davis informed her superiors that the truck smelled like marijuana. The Plaintiff's contention that he had only smoked a cigar does not destroy the "articulable basis" for the reasonable suspicion. This Court therefore rejects Plaintiff's third cause of action. First, because there was an articulable basis for suspecting that the Plaintiff had used drugs on the job, that constitutes a reasonable suspicion for the conducting of urinalysis. Second, the circumstances under which the Plaintiff worked were such that the government's interests outweigh the Plaintiff's privacy interests and therefore makes a search even without reasonable suspicion constitutional under the circumstances.

■ Three additional reasons, specifically enumerated by the *Skinner* Court, weigh heavily in favor of granting the Defendants Motion for Summary Judgment on the Federal Constitutional claims asserted above. First, the fact that the city has the test performed by a doctor in a normal medical setting. Second, the Plaintiff's working in a highly regulated industry leads to a reduced expectation of privacy. Third, the city's drug testing policy serves as a deterrent to drug and alcohol abuse by employees.

■ Citing *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the *Skinner* Court affirmed that drug or alcohol testing when done in a normal medical setting has become so common as to be a minimal intrusion on an individual's privacy. The Court held that "*Schmerber* thus confirmed 'society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.' " *Skinner*, 109 S.Ct. at 1417, *quoting Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

Here the city sent the Plaintiff to Dr. Riser's office and made all the arrangements to have the testing and laboratory work done in a normal medical setting. The results of the test were not released to the city under the drug testing policy unless the tests were positive for drugs and the results were never made available to law enforcement agencies. These safeguards make the city's drug testing policy fall well short of the outer limits of allowable intrusions on the Plaintiff's privacy or bodily integrity, especially in light of the

substantial governmental interests involved.

■ When an employee chooses to work in a highly regulated industry and does so knowing that there is a drug testing policy in place that may cover that employee under specified circumstances, that employee has a diminished expectation of privacy. *Skinner*, 109 S.Ct. at 1418. The Plaintiff admitted in deposition testimony that he was aware of the drug testing policy for city employees well in advance of this incident. Under the *Skinner* analysis the fact that the Plaintiff's fitness and capacity to perform his duties may be directly related to his safety on the job and the safety of other workers and the general public makes the city's need for this type of testing compelling. *Skinner* at 1419.

Finally, one of the purposes of any drug policy is to deter the use or abuse of intoxicants by all employees because of the possibility that an employee covered by the policy might have to submit to drug testing and the almost certain discovery of the prohibited conduct. Though the cities drug testing policy may not have stopped this Plaintiff's use of drugs, there is still a significant probability that it will deter others and thus increase the safety and well being of the general public. The *Skinner* Court expressly approved of the consideration of the deterrent effect in establishing the reasonableness of the policy. *Skinner* at 1420. Here the city's policy will undoubtedly have the desired effect on at least some employees.

■ In his Fourth cause of action the Plaintiff makes the argument that the fact that the urinalysis cannot establish the use of either alcohol or drugs at a specific time, while on the job, makes the results of the test irrelevant and the conducting of the test unreasonable. This entire line of argument was expressly raised in *Skinner* and directly rejected. *Skinner* at 1421. Quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the *Skinner* Court held "it is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination [of the point in issue] more probable or less probable than it would be without the evidence.'" Here the results of an accurate urine test would have the tendency to either make the existence of drug use on the job much more probable or totally exonerate the employee. That is far more than is required. Therefore the Defendants Motion for Summary Judgment as to the Plaintiff's fourth cause of action must be granted.

■ The Plaintiff's fifth cause of action attempts to allege that the Plaintiff was actually fired for being unable to provide a second urine specimen within one hour of the first specimen. However, this simply disregards the facts in the case. Plaintiff has not contested the fact that the city policy required that the urine specimen be given on the day that the supervisors suspicions were aroused. Furthermore, the city's established procedure for handling the urinalysis collection and the timetables required by the city's policy are not a clear violation of the Plaintiff's due process under the United States Constitution. Therefore, this Court finds that summary judgment will be granted as to the Plaintiff's fifth federal cause of action.

The Plaintiff's sixth cause of action alleges that the physical examination and specimen collection and analysis were done without legal right and therefore constituted a trespass upon Plaintiff's person. Since this Court has already found that the search does not violate the United States Constitution, no cause of action for trespass can be supported by a violation of the United States Constitution.

■ The Plaintiff's seventh cause of action alleges the circumstances of the taking of the urine sample caused him sever emotional distress and were in violation of his constitutional rights. Both the *Skinner* and the *Schmerber* Courts expressly rejected this contention, stating that when drug testing is done in a normal medical setting the intrusion into an individual's privacy is minimal. *Skinner*, 109 S.Ct. at 1417.

The Plaintiff's eighth cause of action alleges that the Defendants conspired together under color of law to violate the Plaintiff's constitutional rights. Since this Court has previously ruled that the Defendants did not violate the Plaintiff's constitutional rights under the United States Constitution, there can be no conspiracy to violate the Plaintiff's rights.

Plaintiff's ninth and final cause of action is that the Defendants violated Title 42 U.S.C. § 1983 of the United States Code. This Court's ruling earlier in this Opinion that the search conducted by the Defendants was constitutional precludes any Title 42 U.S.C. § 1983 action based on the violation of some federal right.

### THE TEXAS STATE CAUSES OF ACTION

The Plaintiff has alleged that in addition to the federal causes of action addressed above, there are parallel state rights which have been violated in several of these causes of action. The Plaintiff's first cause of action under Article 1, Section 9 of the Texas Constitution is based on the Texas Supreme Court's holding in *Texas State Employees Union v. Texas Department of Mental Health and Mental Retardation*, 746 S.W.2d 203 (Tex.1987) ("TSEU").

The *TSEU* Court held "the Texas Constitution protects personal privacy from unreasonable intrusion. This right to privacy should yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental objective that can be achieved by no less intrusive, more reasonable means." The language and reasoning of the *TSEU* Opinion establishes a balancing test which weighs the governmental interest against the reasonableness or unreasonableness of the intrusion into the individual's privacy. Stated differently, the Court must balance how compelling the governmental objective is against the level of intrusion required on the individual's privacy and the availability of any less intrusive means to achieve the same objective.

In *TSEU* the Texas Supreme Court found that the Department of Mental Health's use of a polygraph examination during the course of an investigation of suspected patient abuse failed this balancing test. The Court articulated four distinguishable reasons why the polygraph examination in *TSEU* failed the balance.

First, the Texas Supreme Court held that although the Department of Mental Health's interest was in many respects compelling, that interest was not as compelling as the public health and welfare concerns that justified polygraph tests of police and fire fighters. The force of the *TSEU* Courts logic establishes a continuum of state interests that extends from those of limited importance at one extreme to the life and death emergency at the other end.

Second, the Court went on to find that a polygraph's "intrusion is highly offensive to a regular person." The Court stated that the repugnance of the polygraph examination was heightened by the fact that the Department of Mental Health employees were required to answer intensely personal questions as a part of the polygraph examination. These intensely personal questions were not even remotely related to the person's job or conduct while on the job and were not remotely relevant to the Department's investigation or purpose.

Third, the *TSEU* Court found that in light of the established unreliability of polygraph testing, the answers gathered in the examination were simply not of sufficient value to justify the intrusion on the employee's privacy. *TSEU* at 206 n. 3 ("The Union's expert testified that at least one study showed a 'false positive' rate of 49–51 percent.").

Finally, the *TSEU* Court held that the polygraph testing was not the least intrusive, most reasonable means available to gain the information needed for the Department's investigation. The Court expressly stated that the Department could require the employees to answer questions that were narrowly and specifically related to the performance of their jobs.

In the case at bar, however, we are faced with a wholly different factual scenario.

First, the governmental objective here is clearly compelling. Like a police officer or a fireman, the Plaintiff's position places him at the controls of instrumentalities which could reek devastation on the general public. The Plaintiff's own deposition testimony clearly establishes that he handles hazardous chemicals, drives public vehicles on the public highways, and at times, oversees the operation of the waste water treatment plant without supervision.

Unlike the Department of Mental Health where only one patient's or at worst, a few patients' care could possibly be in jeopardy, here the Plaintiff can clearly harm the general public in dramatic terms. The operation of a city vehicle on the public streets while under the influence of, or actually smoking, marijuana is a clear invitation for disaster.[1] In addition the potential for a discharge of raw sewage or hazardous chemicals into the public water supply with the concomitant potential for disease or toxic pollution is a compelling public health concern.

On the other side of the scale, we must weigh the intrusiveness of the requested test. Unlike the polygraph examination, the results of the urinalysis testing will not require as intrusive an invasion into the privacy of the employee. Although some facts other than the use of drugs may be revealed by the results of the urinalysis, the test does not require that sensitive and completely irrelevant information be revealed in order to make the test accurate.

More importantly, the intrusion into the person's privacy required for the collection of a urine specimen, when conducted in a normal medical setting, is a routine medical procedure and not a highly offensive and humiliating process like a polygraph examination. Finally, and most compelling of all, the accuracy of the urinalysis results are not reasonably debatable. Unlike the polygraph examination, urinalysis is scientifically accurate. In addition, if a proper specimen is provided, repeat and more sophisticated examinations of the specimen can be done without requiring additional specimens. This procedure makes independent verification of the scientific accuracy of the results possible and provides a way to protect the privacy of the employee from repeated invasion.

In the case at bar the balance struck by the Texas Supreme Court in *TSEU* tilts exactly the opposite direction. Here the interest of the City is clearly compelling and of a nature that more closely approximates the situation involved when police or fire fighters are tested under employment circumstances. In addition, urinalysis is less intrusive, less repugnant or humiliating, and far more accurate. Finally, nothing submitted by either the Plaintiff or the Defendant suggests that there is any less intrusive or more reasonable means for achieving the governmental objective.

This Court therefore finds that the Defendant has established a compelling governmental objective that can be achieved by no less intrusive or more reasonable means. This Court therefore holds that the City of Baytown did not violate the Plaintiff's privacy rights under the Texas Constitution.

All of the other state law causes of action stated by the Plaintiff were wholly dependent on a threshold ruling that the Plaintiff's Texas Constitutional Privacy Rights had been violated. This Court's ruling that the Texas Constitutional Right to Privacy has not been violated makes detailed analysis of the other state law claims unnecessary. This Court therefore finds that the City's Motion for Summary Judgment as to all state causes of action should also be granted.

## CONCLUSION AND ORDER

For the reasons stated above, this Court finds that Summary Judgment for the Defendant should be granted. It is therefore

---

1. The potential for disaster has been well documented both here in Texas and across the country. In September 1989 a Coca–Cola delivery truck driver hit a school bus and twenty one children died in Alton, Texas. The Washington Times, Oct. 2, 1989, at 6, col. 2. In May 1988 an intoxicated driver of a pickup truck hit a church bus head on and twenty seven people died. Twenty four of the dead were teenagers. The New York Times, May 14, 1988, Sec. A, at 1, col. 1.

ORDERED that the Defendants' Motion for Summary Judgment be and is hereby GRANTED.