915 F.2d 1065
 5 Indiv.Empl.Rts.Cas. 1290
 Roy PENNY, et al., Plaintiffs-Appellees, (86-6280),
v.
Thomas KENNEDY, Commissioner of Fire and Police of the City
of Chattanooga, Tennessee, et al., Defendants-Appellants.
Roland M. LOVVORN, et al., Plaintiffs-Appellees, (86-6281),
v.
The CITY OF CHATTANOOGA, TENNESSEE, et al., Defendants-Appellants.
 Nos. 86-6280, 86-6281.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 7, 1988.
Decided Oct. 4, 1990.
 
 Michael A. McMahan, Randall L. Nelson (argued), Chattanooga, Tenn., for defendants-appellants.
 Charles Dupree (argued), Chattanooga, Tenn., for plaintiffs-appellees in No. 86-6280.
 Thomas Woodley (argued), Mulholland & Hickey, Washington, D.C., for plaintiffs-appellees in No. 86-6281.
 Donald Pailen, Corp. Counsel, Terri L. Hayles, Asst. Corp. Counsel, Samuel C. Gardner, amicus counsel, Detroit, Mich., amicus curiae, City of Detroit.
 John R. Fisher, James E. Phillips, Patricia A. Davidson, Vorys, Sater, Seymour, & Pease, Columbus, Ohio, amicus curiae, F.O.P.
 Daniel J. Popeo, Paul D. Damenar, Vicki S. Marani, Washington Legal Foundation, Washington D.C., amicus curiae, Washington Legal Foundation.
 Before MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, MILBURN, GUY, NELSON, RYAN, BOGGS and NORRIS, Circuit Judges; LIVELY* and ENGEL,** Senior Circuit Judges.
 ENGEL, Senior Circuit Judge.
 
 
 1
 These consolidated en banc appeals resulted from separate actions challenging the constitutionality of proposed mandatory urinalysis of the City of Chattanooga's fire fighters and police officers without reasonable cause or suspicion to believe that the employees so tested were using controlled substances. See Lovvorn v. City of Chattanooga, Tenn., 647 F.Supp. 875 (E.D.Tenn.1986), as to the fire fighters, and Penny v. Kennedy, 648 F.Supp. 815 (E.D.Tenn.1986), concerning Chattanooga's police officers. The particularized facts in each of these appeals have been carefully summarized both in the reported district court opinions and in the now-vacated,[1] but nonetheless reported, panel opinions. See Lovvorn v. City of Chattanooga, Tenn., 846 F.2d 1539 (6th Cir.1988), and Penny v. Kennedy, 846 F.2d 1563 (6th Cir.1988).
 
 
 2
 In separate but concurrently considered opinions, the United States District Judge for the Eastern District of Tennessee concluded that the planned mandatory department-wide urinalysis testing of the individuals in question constituted a search and therefore was subject to the protections embodied in the fourth amendment as made applicable to the states by the fourteenth amendment. While recognizing Chattanooga's compelling need to ensure that fire fighters and police officers are free of impairment by the use of drugs in the performance of their tasks, the district judge held that the reasonableness of the search on a department-wide basis had not been established. The district court further concluded that under existing Supreme Court and Sixth Circuit authority the program was violative of the fourth amendment in the absence of any reasonable individualized suspicion that the employee subject to testing is using illegal drugs. In so holding, the trial judge was careful to exclude urinalysis testing conducted as part of the routine physical examinations administered to all employees, except where such testing might be a pretext for an otherwise unreasonable search and seizure. Lovvorn, 647 F.Supp. at 881 n. 7.
 
 
 3
 The district court therefore entered injunctions in each case prohibiting drug tests on a wholesale basis. As to the fire fighters, the trial judge concluded that "[t]he tests which the City proposes at this time to administer to all Chattanooga fire fighters would violate the fire fighters' rights under the fourth amendment. This is not to say, however, that the City is foreclosed from testing fire fighters for drugs. The City may conduct such tests if it has a reasonable suspicion to do so; the scope of the tests is related to the objective engendered by the reasonable suspicion; and the intrusiveness of the tests is minimized to the extent it can be without jeopardizing the integrity of the tests." Lovvorn, 647 F.Supp. at 883.
 
 
 4
 Likewise, as to the police officers, the trial judge held that "[t]here is no real difference in the balance of the respective rights of the City and the police officers under the fourth amendment from that in the fire fighters case. For reasons that are so obvious as to not require elaboration, the public does not want a police force that uses illegal drugs. On the other hand, police officers, like fire fighters, are possessed of a certain level of constitutional protection which cannot be lowered. For the reasons stated by this Court in its opinion in the fire fighters case, the defendants must have reasonable suspicion before they may test police officers for illegal drugs. On the facts presented to this Court, there is no reasonable suspicion which would justify the administration of these tests at this time. Therefore, the current tests violate the fourth amendment rights of Chattanooga police officers.... As was emphasized in the Court's opinion in the fire fighters case, this does not mean that the Chattanooga Police Department may not administer urine tests to its police officers for the presence of illegal drugs. This decision does mean that if such tests are given, they must be given on reasonable suspicion, their scope must be related to their objective, and they must not be excessively intrusive." Penny, 648 F.Supp. at 817.
 
 
 5
 Appeals were taken in each case and were assigned to a regularly constituted three-judge panel of this court. In separate but concurrent opinions, with Judge Guy dissenting in each, the decisions of the district judge were affirmed. Our full court granted a rehearing en banc and after further briefing, oral arguments were held. Since it was apparent that similar cases were pending before the United States Supreme Court at that time, the parties and the full court agreed that further decisions in these cases would be deferred until the Supreme Court decisions were forthcoming. Those decisions have been issued and indeed have proved most useful to the resolution of the issues presented in these appeals. See National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
 
 
 6
 Based upon the Supreme Court decisions in Von Raab and Skinner, we conclude that certain issues in the current appeals are no longer subject to question. First, it is altogether evident that mandatory urinalysis testing, conducted pursuant to state action, infringes an employee's reasonable expectation of privacy and therefore constitutes a search under the fourth amendment. Further, it is evident that as to the employees involved in each of these opinions,[2] Chattanooga has a compelling interest in ensuring that the duties of fire fighters and police officers are performed free of any risk of impairment by the use of illegal drugs. Equally applicable in this case is the Supreme Court's statement in Skinner that employees "subject to the tests discharge duties fraught with such risks of injury to others [and themselves] that even a momentary lapse of attention can have disastrous consequences." 109 S.Ct. at 1419.
 
 
 7
 Next, it is apparent that the district court's principal conclusion that drug-testing of these employees must be based upon particularized suspicion of drug or alcohol use would seriously impede the employer's ability to obtain information needed to advance the established compelling interest. Without reviewing all of the rationale or the various considerations marshaled by the majority in Von Raab and Skinner, it is sufficient to hold here that the district court's conclusion that this employer must require a reasonable and particularized suspicion as a precondition to any such testing must perforce fail. The district court's rulings in this respect must be reversed.
 
 
 8
 Because in each instance the district court and the prior panel held that the entire urinalysis program violated the constitution, it was not necessary fully to address other concerns that had been raised in the district court. In the fire fighters case in particular, the plaintiffs alleged that the proposed 1986 testing program, which was to look like the 1985 testing, was to be conducted without adequately established standards to protect against potential abuse. Although Von Raab and Skinner generally validate urinalysis for individuals in the categories of plaintiffs here, it by no means necessarily follows that all of the protections of the fourth amendment have thereby been fully satisfied regardless of the integrity of the test and of the manner and means by which the test is given. So much is apparent in the language of Justice Kennedy in Von Raab, where he observed that the intrusion of the drug-testing program challenged there was defined narrowly and specifically, particularly since the employee subject to testing "knows that he must take a drug test, and is likewise aware of the procedures the [Customs] Service must follow in administering the test. A covered employee is simply not subject 'to the discretion of the official in the field.' " Von Raab, 109 S.Ct. at 1391 (quoting Camara v. Municipal Court, 387 U.S. 523, 532, 87 S.Ct. 1727, 1732-33, 18 L.Ed.2d 930 (1967)); see also Skinner, 109 S.Ct. at 1422 ("In light of the limited discretion exercised by the railroad employers under the regulations ... we believe that it is reasonable to conduct such tests in the absence of a warrant or reasonable suspicion that any particular employee may be impaired.").
 
 
 9
 Such concerns for confined discretion were also clearly on the mind of the district judge here in Lovvorn when he stated that "clearly defined standards are lacking in this case. No standards for the frequency, purpose, or methods of conducting the tests have been established by Chattanooga's City Commission." 647 F.Supp. at 881. What seems to be of great concern to the parties, at least in the district court, is the integrity of the tests, the intrusiveness in the manner of their taking, and the scope of the testing.[3] In their briefs and arguments before this court, however, the parties have not focused upon these issues. The inadequate presentation is largely due to the fact that these issues were largely subsumed in the principal challenge to the lack of a "reasonable suspicion" requirement in the procedure.
 
 
 10
 In short, we are uncertain from the record here whether the due process and fourth amendment aspects of the actual carrying out of the search, to the extent they have been raised, have been adequately addressed.[4] As Judge Guy stated in his dissent in Lovvorn, "[i]t may well be that after the 'reasonable suspicion' hurdle is removed, the program may have other deficiencies." 846 F.2d at 1539 n. 32 (Guy, J., dissenting).
 
 
 11
 Based upon this observation, Judge Guy urged a reversal and remand for further proceedings. Upon reflection, we conclude that this is the better course than one that would immerse us at this stage in issues which have not been adequately presented to us. Much time has passed and a great deal has been written on the subject and no doubt the City of Chattanooga, the parties, and the court will profit from that additional experience and particularly by a reconsideration of the procedures in light of the Supreme Court's language in Von Raab and Skinner. The scope of the remand, of course, will be limited to those issues which have been or are properly raised in the instant proceedings.
 
 
 12
 Accordingly, the judgments of the district court in Lovvorn and Penny are VACATED and the causes REMANDED for further proceedings consistent herewith and particularly consistent with the Supreme Court's decisions in Von Raab and Skinner.
 
 
 13
 BOYCE F. MARTIN, Jr., Circuit Judge, concurring.
 
 
 14
 It is beyond doubt that persons entrusted with enforcing laws and ensuring public safety should be exceedingly circumspect in their own behavior and comport their personal lives in accordance with the laws and practices they are sworn to uphold. See Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, ----, 109 S.Ct. 1402, 1418, 103 L.Ed.2d 639, 666 (1989); National Treasury Employees Union v. Von Raab, 489 U.S. 656, ----, 109 S.Ct. 1384, 1393-94, 103 L.Ed.2d 685, 705-06 (1989). This duty, however, was not newly-born during the recently declared "war" on illegal drugs. Public safety officers have, unfortunately, always been subject to the same temptations afforded to ordinary citizens in their communities. These temptations, however, will not be removed by stampeding those officers' constitutional rights.
 
 As the Skinner majority stated:
 
 15
 the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. What is reasonable, of course, "depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Thus the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."
 
 
 16
 Skinner, 489 U.S. at ----, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (citations omitted). Standardless, surprise drug testing of public safety officers not only violates the balance sought by the Court in Skinner, but recalls bleak periods in our history where society winked at the Constitution in its zeal to achieve what we now know in retrospect were ill-conceived goals. As Justice Marshall stated in his dissent in Skinner:
 
 
 17
 The issue in this case is not whether declaring a war on illegal drugs is good public policy. The importance of ridding our society of such drugs is, by now, apparent to all. Rather, the issue here is whether the Government's deployment in that war of a particularly draconian weapon--the compulsory collection of railroad workers' blood and urine--comports with the Fourth Amendment. Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great. History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. The World War II relocation-camp cases, and the Red Scare and McCarthy-Era internal subversion cases, are only the most extreme reminders that when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it.
 
 
 18
 Skinner, 489 U.S. at ----, 109 S.Ct. at 1422, 103 L.Ed.2d at 671 (citations omitted). "There is no drug exception to the Constitution, any more than there is a communism exception or an exception for other real or imagined sources of domestic unrest." Id. at ----, 109 S.Ct. at 1426, 103 L.Ed.2d at 675.
 
 
 19
 Despite my view that random drug testing violates the fourth amendment, recent Supreme Court decisions clearly uphold the general constitutionality of random drug testing against fourth amendment challenges where no particularized probable cause or reasonable suspicion showing was made by the government employer. See Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). To that extent, I am bound to concur with the majority in this case. However, it is also clear that the government employer, here, the City of Chattanooga, Tennessee, must narrowly and specifically define its drug testing program so that the employees subject to such testing both know that they are subject to such random testing, and, more importantly, are aware of the procedures the City must follow in administering the testing program. See Von Raab, 489 U.S. at ----, 109 S.Ct. at 1391, 103 L.Ed.2d at 703.
 
 
 20
 As pointed out by the majority, in Von Raab and Skinner, the employers' constitutional drug testing programs were distinguished by the limited discretion given to the employer in performing such tests. In this case the district court expressed concern that clearly defined standards for the drug testing program were lacking. It is my belief that even under Skinner, the Chattanooga drug testing program before us lacks the precision necessary to protect the public safety officers in this case from unconstitutional intrusion and inquiry by the City of Chattanooga.
 
 
 21
 For example, the Chattanooga program fails to test certain "civilian" employers with direct public safety responsibility--the asserted governmental concern. In Von Raab, the Court while generally upholding government's testing program, remanded, in part, because one of the drug testing directives included Customs department employees who were not likely to gain access to sensitive information--the asserted reason for the enactment of the directive. Von Raab, 489 U.S. at ----, 109 S.Ct. at 1397, 103 L.Ed.2d at 710. Like the testing directives in Von Raab, it is unclear whether Chattanooga's testing program is tailored to test those public safety employees who have direct contact with citizens of Chattanooga in their efforts to enforce that city's laws and to protect its citizens. Here, Chattanooga distinguishes between "civilian" employees and "noncivilian" employees as a justification for not testing its radio dispatchers. For argument's sake, I agree that certain "civilian" employees whose jobs do not directly entail the protection of Chattanoogans, such as accountants, clerks, or secretaries within the police or fire departments, should not be tested under the asserted purpose for the City's testing program. However, I am concerned that radio dispatchers escape the testing mandate because they are "civilians." Those dispatchers are, as any frantic 911 caller knows, vital to the protection of lives and property. The all-too facile dismissal of dispatchers from the city's testing mandate increases my concern that the testing program is not tailored with the precision required to pass the constitutional standard adopted in Von Raab and Skinner. The use of broad categories such as civilian/noncivilian results in a program that does not meet the City's asserted purposes in enacting the program.
 
 
 22
 My only hope is the district court and the City of Chattanooga endeavor to limit the proposed drug testing procedures to comply with the Skinner and Von Raab majority's demand for limited official discretion and heed the Skinner dissent's concerns that drug testing policies and procedures represent the lessons we have learned from other "witch hunts".
 
 
 23
 WELLFORD, Circuit Judge, concurring.
 
 
 24
 I would emphasize in this case the compelling interest of the City of Chattanooga that policemen and firefighters in that city be free from risk of impairment while on duty, or subject to immediate call for duty, by use of controlled substances or illicit drugs. This government interest "in ensuring the safety of the ... public and of the employees themselves plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty." Skinner v. Railway Labor Executives Association, 489 U.S. 602, 109 S.Ct. 1402, 1415, 103 L.Ed.2d 639 (1989). I agree, therefore, that limited mandatory testing in this case is permissible from a substantive constitutional standpoint if reasonably conducted.
 
 
 25
 I agree, further, with Chief Judge Gibbons' statements in Policemen's Benev. Ass'n of N.J. v. Washington Township, 850 F.2d 133 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), about the nature of the "business" of policing, and believe what he says in relation to New Jersey is equally applicable in Tennessee:
 
 
 26
 [T]he police industry is probably the most highly regulated, with respect to performance of its employees, of any industry in New Jersey. When compared with the history of regulation held in Shoemaker [v. Handel, 795 F.2d 1136 (3d Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986),] to be sufficient for application of the administrative search exception, the occupation of police officer is far more intensely regulated. The Washington Township police officers are members of quasi-military organizations, called upon for duty at all times, armed at almost all times, and exercising the most awesome and dangerous power that a democratic state possesses with respect to its residents--the power to use lawful force to arrest and detain them. The need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power is significantly greater than the state's need to instill confidence in the integrity of the horse racing industry.
 
 
 27
 Id. at 141.
 
 
 28
 Examples of testing procedures that meet due process requirements are set out in Skinner and in National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The defendant city has, therefore, established guidelines for future mandatory urinalysis and/or blood testing. Surely Chattanooga may take appropriate and reasonable action to foreclose service by police officers and firefighters who may be found to violate a reasonable policy designed to detect the use or possession of illegal drugs and/or alcohol by these persons so closely tied to public safety. See Smith v. White, 666 F.Supp. 1085 (E.D.Tenn.1987), aff'd, 857 F.2d 1475 (6th Cir.1988) (table).
 
 
 29
 I CONCUR, under these principles, with the decision of Judge Engel in REVERSING and REMANDING to the district court the consolidated cases before us.
 
 
 
 *
 Honorable Pierce Lively assumed senior status December 31, 1988
 
 
 **
 Honorable Albert J. Engel assumed senior status October 1, 1989
 
 
 [1]
 Rule 14(a) of the Sixth Circuit Rules provides, in part: "The effect of the granting of a rehearing en banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket as a pending appeal."
 
 
 [2]
 The individual plaintiffs in Penny are all police officers. In Lovvorn, individual plaintiffs Roland Lovvorn, Richard Jarvis, and Michael Kennedy are fire fighters. Plaintiffs Roland Lovvorn and Michael Kennedy also were cross-trained as emergency medical personnel
 
 
 [3]
 In his special concurrence in Lovvorn, Judge Johnstone stressed other dangers implicit in urinalysis, such as the danger that the testing will reveal medical or physical conditions other than drug use, thus affecting privacy interests. Lovvorn, 846 F.2d at 1550 (Johnstone, Dist. Judge, concurring). Judge Johnstone was particularly concerned that the lack of an articulable suspicion of individualized drug use would endanger disclosure of other conditions as well. In our view, there is no difference in the risk of disclosure between the tests challenged here and tests taken as part of a routine physical. Further, there is no allegation of this kind of abuse in the litigation before us
 
 
 [4]
 One issue that appears no longer subject to question is the adequacy of the procedures which were followed by the Chattanooga Fire Department in processing those cases in which the presence of illegal drugs in the urine had been detected under the prior drug-testing program. To the extent that these procedures were to be followed in the proposed program, the district court after a careful review concluded that the employer's pre- and post-deprivation procedures and the due process available under state law constituted a sufficient procedural framework to review the test results and the administration of discipline. That this issue has been resolved was similarly recognized by the panel decision in Lovvorn, which acknowledged that "the fire fighters do not challenge the district court's holding that the 1986 testing program did not violate due process requirements." 846 F.2d at 1542. Further, we should note that none of the plaintiffs argues that he was adversely affected by such procedures. In fact, the plaintiffs in both Lovvorn and Penny actually challenged the proposed 1986 program, which the parties stipulated would be conducted similarly to the 1985 testing