William CARRELLI, Plaintiff–Appellant, Cross–Appellee,

v.

Robert S. GINSBURG; Edward A. Babst; Norman Barron; John Tumbri; Dr. William Nichols; Dr. Vernon Tharp; Charles May; Leslie Skinner, Defendants–Appellees, Cross–Appellants.

Nos. 90–3844, 90–3901.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 31, 1991.

Decided Feb. 12, 1992.

---

David Torchia (argued and briefed), Tobias & Kraus, Cincinnati, Ohio, for plaintiff-appellant, cross-appellee.

Rita S. Eppler (argued and briefed), Office of Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellees, cross-appellants.

Jon L. Fleischaker, Wyatt, Tarrant & Combs, Louisville, Ky., Kevin L. Murphy, Covington, Ky., for defendant Thoroughbred Times.

Before KEITH, NELSON and SILER, Circuit Judges.

KEITH, Circuit Judge.

Plaintiff-appellant William Carrelli ("Carrelli") appealed the adverse rulings of the district court which dismiss his constitutional challenges to the Ohio State Racing Commission's ("the Commission") Human Drug Abuse Regulations. In substance, Carrelli's claim asserted that the regulations were constitutionally invalid on their face, and in the alternative, that the actions of Commission officials violated his right to be free from unreasonable searches and his right to privacy, secured by the fourth and fourteenth amendments, respectively. The district court upheld the facial validity of the Ohio regulation and also ruled that the Commission officials did not violate Carrelli's fourth amendment rights. We agree and AFFIRM these determinations. However, the district court concluded that the Commission violated Carrelli's right to privacy, secured by the fourteenth amendment, with its repeated publication of a previous positive test result. The district court enjoined the Commission from the "unnecessary" publication of all test results. The Commission cross appealed this determination. We REVERSE this district court ruling and set aside the injunction.

I.

The Ohio State Racing Commission regulates the horse racing industry in the State of Ohio. The Commission is empowered to

"prescribe the rules and conditions under which horse racing may be conducted." Ohio Rev.Code § 3769.03. Pursuant to this authority, the Commission promulgated its "Thoroughbred and Quarterhorse; Medication and Drug Related Rules" and its Human Drug Abuse component. Ohio Admin.Code § 3769–8–09 (1985). The stated purpose of the Commission's drug screening procedure is "to ensure the public safety and protect the integrity of horse racing in the state of Ohio." Ohio Admin.Code § 3769–8–09(A).[1] The challenged provision stated:

> The personal use of any drug of abuse, as defined in division (A) of Section 3719.-011 of the Revised Code, is prohibited without a legal prescription. Acting with *reasonable cause*, the presiding judge, executive director of the Ohio state racing commission, any member of the Ohio state racing commission, any investigator employed by the Ohio state racing commission, or the chief of security at the track may direct any licensee, as defined in paragraph (B) of this rule, to submit a sample of their urine to the trade physician or other representative of the commission. The urine sample shall be provided in the manner prescribed by the commission.

Ohio Admin.Code § 3769–08–9(C) (emphasis added).[2] The Commission enacted this rule to control the use of illicit drugs by all of its licensed personnel whenever the licensee was acting within the scope of his license.

Carrelli was a licensed thoroughbred trainer with the Commission in 1985, 1986, and late 1987. Carrelli had held his license for nearly two years when on July 26, 1986, Investigator Charles May ("Investigator May") requested a urine sample from him at River Downs Race Track, in Cincinnati, Ohio. The testimony of Investigator May indicated that the "reasonable cause" standard was satisfied because Investigator May received information that Carrelli sold and used illicit drugs from a reliable informant; Carrelli had listed a 1981 drug conviction on his 1986 licensure application; and the Commission had received calls regarding Carrelli's drug use. The urine sample tested positive for the presence of marijuana and cocaine. The Commission informed Carrelli of the results and referred him to the applicable consequences listed in Ohio Admin.Code § 3769–8–09(F)(1).[3]

On October 17, 1986, the Commission again asked Carrelli to supply a urine sample based on the recent positive test result.[4] Carrelli refused to provide the sample, and

---

**1.** In *Dimeo v. Griffin,* 943 F.2d 679 (7th Cir. 1991), the Seventh Circuit explained in great detail the validity of these goals when it discussed the propriety of the Illinois Racing Board's human drug testing rule for horse racing participants. *See also, Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir.) *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

**2.** The amended provision, effective in March of 1987, now reads:

The personal use of any drug of abuse, as defined in division (A) of section 3719.011 of the Revised Code, is prohibited without a legal prescription. Acting with reasonable cause or through random selection by lottery, the state steward, secretary of the Ohio state racing commission, any investigator employed by the Ohio state racing commission, or the chief of security at the track may direct any licensee, as defined in paragraph (B) of this rule, to submit a sample of their urine to the track physician or other representative of the commission. The urine sample shall be provided in the manner prescribed by the

commission. Any random selection by lottery may be witnessed by a representative of the licensee group involved. The commission may alter the number of names drawn each day and for each race.
Ohio Admin.Code § 3769–8–09(C).

**3.** Section 3769–8–09(F) states:

In the event that the urine analysis results should disclose the presence of any drug of abuse prohibited by paragraph (C) of this rule, the following action shall be taken:
(1) For the first offense, an official ruling will be issued notifying the licensee that his or her sample or test was positive for a prohibited substance and that he or she will be subject to future mandatory drug testing. In addition, upon the delivery of such official ruling, the individual shall be immediately suspended for ten days and fined two hundred fifty dollars.

**4.** An amendment to the drug testing provision, effective December 6, 1986, provides that an individual may be subject to future tests upon testing positive. *See supra* note 3.

the track stewards at River Downs Race Track imposed upon him a $250.00 fine and sixty day suspension. *See* Ohio Admin.Code § 3769–8–09(E).[5] Carrelli appealed the ruling to the Commission and a hearing was scheduled. Prior to Carrelli's hearing, the Commission discovered an apparent misrepresentation in Carrelli's application, and issued a notice of intent to revoke, suspend, or take other action against Carrelli's license.[6]

An administrative hearing was held on January 21, 1987 before the Commission pursuant to the Ohio Rev.Code § 119.09. Following the presentation of evidence, the Commission ordered the revocation of Carrelli's 1986 thoroughbred trainer's license. The notice read:

> Based upon the above Conclusions of Law, it is hereby ORDERED that the 1986 thoroughbred trainer license of Mr. Carrelli be revoked. In addition, based upon the totality of the violations indicated in the above Conclusions of Law, and upon consideration of the suspension and fine ordered in Steward's Ruling No. 151 dated October 19, 1986 at River Downs Race Track, under authority of Ohio Rules of Racing 3769–2–99, the Commission hereby ORDERS that Mr. Carrelli shall be placed on the stop list, shall be ineligible for any type of Ohio State Racing Commission license in 1987, shall be ruled off all Ohio race tracks in 1987 and shall not be eligible for any type of license in Ohio until such time as he appears before this Commission, agrees to comply with the provisions of

Commission Rule 3769–8–09 and submits satisfactory proof to this Commission that he has successfully completed a drug rehabilitation program certified by the Ohio Department of Mental Health, Bureau of Drug Abuse, or the Joint Commission of Accrediting of Hospitals.

Following unsuccessful appeals in the state of Ohio court system, Carrelli applied for another license in April 1987.[7] The Commission notified Carrelli of their intent to deny his application and of his right to request a hearing. Carrelli did not request a hearing, and in August 1987, the Commission denied his application for a 1987 thoroughbred trainer's license.

Despite his failure to request a hearing, Carrelli appealed the August decision. However, the parties resolved this dispute by entering into a settlement agreement. The terms provided that Carrelli could secure a 1987 thoroughbred trainer's license on condition that he not race on or patronize any Ohio race tracks for the remainder of 1987. Also, Carrelli's attorney, David Torchia, apparently discussed and agreed that Carrelli would submit to a drug test before acquiring the license.

On November 2, 1987, Investigator May was notified of the agreement and given the task of licensing Carrelli. Investigator May licensed Carrelli and requested the urine sample. Carrelli phoned his attorney before submitting to the request. Following the conversation, Carrelli provided the urine sample. The sample ultimately test-

---

**5.** Ohio Admin.Code § 3769–8–09(E) states in pertinent part:

> Failure or refusal of any licensee to supply a valid urine sample when requested to do so by one or more of the persons designated in paragraph (C) of this rule shall subject the licensee to an immediate fine of two hundred and fifty dollars and a suspension of sixty days for a first offense.

**6.** The notice read in pertinent part:

> On your application for a 1986 thoroughbred trainer license, in answer to question no. 7 you stated that: "In 1981 I was convicted of a misdemeanor (drug charge) in Cincinnati, Ohio. Probation of six months (1981)." However, you were actually convicted of

three first degree misdemeanors and sentenced to 180 concurrent days in jail, with 165 days suspended, with two years probation.

> Also on your application for a 1986 thoroughbred trainer license, in answer to the questions: "Within the past five years have you been denied a license by any racing commission or other recognized racing authority?" and "Have you ever been ejected from or denied the privileges of a race track?" you answered, "No" when in fact you have been denied a license in the past five years and also have been denied the privileges of more than one race track.

**7.** Carrelli sought the Ohio license so that he could obtain a Kentucky license through reciprocity in the trade.

ed negative for the presence of illegal drugs.

On January 6, 1988, Carrelli filed a complaint in the United States District Court for the Southern District of Ohio alleging constitutional violations under 42 U.S.C. § 1983, invasion of his right to privacy, and pendent Ohio common law claims. Carrelli named the following commission employees and affiliates in the suit: Robert S. Ginsburg, Chairman of the Commission; Edward Babst, Executive Director; Charles May, Investigator Supervisor; Leslie Skinner, Public Information Officer; and Vernon Tharp, William Nichols, John Tumbri, and Norman Barron, members of the Commission. The district court summarized the allegations as follows:

> Plaintiff alleges these causes of action against these state defendants ...: (1) that the Human Drug Abuse Regulations promulgated by the Commissioners violate the fourth and fourteenth amendment of the Constitution; (2) that defendants Babst and May violated plaintiff's right to be free of unreasonable searches and seizures by demanding a urine sample from plaintiff on November 2, 1987; (3) that defendants Babst and May violated plaintiff's constitutional right to privacy by demanding this urine sample; (4) that the defendant Commissioners abused their statutory power and authority and retaliated against plaintiff by issuing an Adjudication Order on February 18, 1987; (5) that said Adjudication Order violated plaintiff's rights of Equal Protection and constituted a retaliatory deprivation of liberty and property without due process of law; (6) that the defendant Commissioners violated plaintiff's constitutional right to privacy by failing to ensure the confidentiality of the July 21, 1986 test results by publishing those results; and (7) that the defendant Commissioners invaded plaintiff's common law right to privacy thereby causing him

loss of income, emotional distress, damages to his reputation and extreme embarrassment and humiliation.

Carrelli moved for summary judgment, seeking declaratory and injunctive relief with regard to the constitutionality of the Commission's human drug testing rules and monetary relief from the named defendants. Carrelli's motion argued that the rules violate the fourth amendment because the drug tests are searches without probable cause. Moreover, Carrelli argued that the November 2, 1987, drug screening was done without reasonable cause as required by the statute.

The Commission also moved for summary judgment arguing that, as a matter of law, the rules are constitutionally valid on their face and as applied to Carrelli. Furthermore, Commission officials asserted that they were entitled to the defense of qualified immunity because no clearly established rights with regard to drug testing existed when the Ohio officials implemented Ohio Admin.Code § 3769–8–09. Moreover, the Commission argued that Carrelli's equal protection claim failed to state a claim upon which relief could be granted and that the pendent state claims must be dismissed for lack of subject matter jurisdiction.

The United States District Court for the Southern District of Ohio granted the Commission's summary judgment motion in large part. The district court determined as a threshold matter that the Commission officials had qualified immunity from 42 U.S.C. § 1983 claims under the principles of *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). The district court then determined that the Commission's regulations that allow human drug testing only upon reasonable cause is constitutional and dismissed that cause of action.[8] The district court also held that

---

**8.** The district court also held that Carrelli lacked standing to challenge the Commission's random drug testing provision because that rule was not effective at the time the Commission requested a urine sample from Carrelli. Carrelli, therefore, suffered no cognizable injury. *See Valley Forge Christian College v. Americans United for*

*Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1986). *See also, Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (The complaint in question "must allege an injury to himself that is distinct and palpable

the November 2, 1987, drug test was a reasonable search within the meaning of the fourth amendment; dismissed the equal protection claim for failure to state a claim upon which relief could be granted; and dismissed the pendent Ohio tort law claims because the law of Ohio was unsettled.

The district court, however, granted partial summary judgment for Carrelli finding that the Commission invaded his privacy interests with the repeated publication of his positive test results. The district court then enjoined the Commission to amend its human drug testing rules to prevent the "unnecessary publication of test results." Timely appeals by both Carrelli and the Commission officials followed.[9]

## II.

Carrelli first argues that the Human Drug Abuse Regulations violate the fourth amendment, both facially and as applied to him. The fourth amendment explicitly recognizes the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend IV. Modern case law has interpreted this prohibition as a guarantee of an individual's legitimate expectations of privacy from intrusion by a governmental entity. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 613–14, 109 S.Ct. 1402, 1410–11, 103 L.Ed.2d 639 (1989); *Dimeo v. Griffin*, 943 F.2d 679, 682 (7th Cir.1991). *See generally, Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Supreme Court has recognized that a urinalysis conducted by a governmental agency constitutes a "search" within the meaning of the fourth

amendment. *See Skinner*, 489 U.S. at 616, 109 S.Ct. at 1412, and *Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The Supreme Court has also observed that "the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." *Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413.

*Skinner* and *Von Raab* are the Supreme Court's authoritative pronouncements on drug testing. Neither involved the horse racing industry nor "reasonable cause" testing. However, both are instructive on the propriety of the human drug testing rules promulgated by the Ohio Commission.

In *Skinner*, the Supreme Court concluded that random drug testing of certain railroad employees was constitutional. The Court balanced the privacy interests of the individual employee with the government's interest in regulating its employees for the public's safety. A railroad employee whose mental and physical faculties are drug-impaired risks injury to myriad persons with potentially lethal consequences. This "special need" justified the departure from usual constitutional requirements, and the Court dispensed with the warrant requirement and permitted the random administrative screening for certain railroad personnel without individualized suspicion.

Similarly, in *Von Raab*, the Supreme Court upheld the United States Customs Service drug testing for service employees who are involved in the interdiction of illegal drugs and who have positions that require them to carry firearms. *Von Raab*, 489 U.S. at 672, 109 S.Ct. at 1394. The program requires those employees,

---

and the alleged harm must be actual and imminent, not 'conjectural' or 'hypothetical' ").

**9.** On appeal, the parties did not challenge the district court's dismissal of Carrelli's equal protection or pendent state claims. These claims are not properly before this Court, and we, therefore, do not address them.

The Commission also argued in its brief on cross appeal that, pursuant to Ohio Rev.Code § 2743.02(A)(1), Carrelli waived his claims against the individual defendants by filing and

dismissing a complaint in the Ohio Court of Claims. We first note that this Court in *Leaman v. Ohio Dept. of Mental Retardation*, 825 F.2d 946, 954 (6th Cir.1987), *cert. denied*, 487 U.S. 1204, 108 S.Ct. 2844, 101 L.Ed.2d 882 (1988), characterized this sort of challenge as an affirmative defense. We reject this challenge as inconsistent with the federal practice and procedure in the Federal Rules of Civil Procedure 8(c) (In pleading to a preceding pleading, a party shall set forth affirmatively . . . waiver, and any other matter constituting an avoidance or affirmative defense.).

without a warrant or individualized suspicion, to produce urine samples for random drug screening. The Supreme Court reasoned that this administrative practice was justified by a special governmental need to ensure that those particular Customs employees had unimpeachable integrity and judgment. *Id.* at 674, 109 S.Ct. at 1395. These heavily regulated employees also had a lessened privacy expectation against the government's intrusion. The Court observed that the Customs service is "our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population." *Id.* at 668, 109 S.Ct. at 1392. The majority balanced this special need against the diminished expectation of privacy of the Custom's employees in question and concluded that the government's interest in the administrative search to be greater than that of the employee.

*Skinner* and *Von Raab* uphold "the general constitutionality of random drug testing against fourth amendment challenges where no particularized probable cause or reasonable suspicion showing was made by the government employer." *Penny v. Kennedy*, 915 F.2d 1065, 1069 (6th Cir. 1990) (Martin, J., concurring). We note that a key component in each of the Court sanctioned administrative searches was the "limited discretion given to the employer in performing such tests." *Id.*

In *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Supreme Court also observed that, generally, searches performed without a warrant must be based on probable cause that the person to be searched has violated the law. *Id.* at 340, 105 S.Ct. at 742. However, when countervailing circumstances preclude the insistence upon a probable cause showing, our case law has required "some quantum of individualized suspicion" to satisfy the reasonableness requirement of the fourth amendment. *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417 (citing *United States v. Martinez–Fuerte*, 428 U.S. 543,

560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)).

With regard to reasonableness, we have recently stated:

What is reasonable, of course, "depends on all of the circumstances surrounding the search or seizure and the nature of the search of seizure itself." Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

*Penny v. Kennedy*, 915 F.2d 1065, 1069 (6th Cir.1990) (Martin, J., concurring and citing *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414) (citations omitted). On this background, we evaluate the Ohio drug testing procedure in general and its application to Carrelli, in particular.

### A.

■ Ohio Admin.Code § 3769–8–09 permits officials to screen licensees for illegal drug use only upon a showing of reasonable cause.[10] Carrelli argues on appeal that the regulation is unconstitutional on its face because it does not require a showing of probable cause. Carrelli petitions this Court to require the Commission to meet the established standard for issuance of a warrant before any Commission official can request a licensee to provide a urine sample for drug screening. Neither the explicit language of the fourth amendment nor recent case law mandates the adoption of the probable cause standard in this context.

The fourth amendment simply prohibits "unreasonable" searches. The Supreme Court has recognized that the probable cause standard is particularly applicable in the criminal arena. *See Von Raab*, 489 U.S. at 667, 109 S.Ct. at 1391. In the case at bar, a licensee is required to comply with the administrative regulation that prohibits drug use. Before an official can request a urine sample from a licensee, however, the explicit language of the rule requires the official to demonstrate "reasonable cause"

---

**10.** The random drug testing provision is not on appeal before this Court. We simply address the practice of "reasonable cause" testing implemented by the Commission.

for that particular drug screening. This not only comports with reasonableness requirement in administrative searches but sufficiently limits the discretion of those officials administering the rule.[11]

Moreover, the licensees are participants in a heavily regulated industry. Though not dispositive of the case, we must note that these licensees are subject to a wide array of conditions to acquire and retain their licenses. Licensees are aware that they may be subject to drug screening if a certain quantum of suspicion is attained. A diminished expectation of privacy on the part of licensees, therefore, results from the desire to retain their licenses.

Finally, Ohio's legitimate interests in the safety of those involved in horse racing and the integrity of the industry counterbalance the privacy expectation of the licensees. Some evidence indicates that the horse racing industry may be replete with illegal drug use. *See Dimeo v. Griffin*, 943 F.2d 679 (7th Cir.1991) (discussing the rampant drug use in the Illinois horse racing industry). Ohio sought to bolster public confidence in the industry and eradicate the use of drugs among its licensees by promulgating this rule. Accordingly, the Ohio Commission's human drug testing rule comports with the reasonable search requirement of the fourth amendment.

### B.

Carrelli argues in the alternative that the rule was unconstitutionally applied to him. He asserts on appeal that the Commission lacked reasonable cause to request the urine sample on November 2, 1987. Moreover, he asserts that he was not subject to the testing provision at issue because he was not licensed by the Commission at the time of the test.

■ Initially, as a factual matter, the Commission licensed Carrelli and then requested a urine sample of him. The record clearly established the requisite suspicion for Investigator May's request on Novem-

ber 2, 1987. "Reasonable cause" depends on the entire context within which a given search takes place. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985).

■ Carrelli provided misinformation to the Commission on a previous licensure application regarding his involvement with illegal drugs. The Commission decided to revoke his thoroughbred trainer's license after Carrelli tested positive in a properly substantiated and administered drug test in July of 1986, and then refused a subsequent follow-up drug screening in October of 1986. The November 2, 1987, request for a urine sample was made in conjunction with the settlement of Carrelli's appeal of the Commission's denial of his August 1987 re-application for a trainer's license. Pursuant to the settlement, the Commission ultimately granted him a license.

The totality of circumstances surrounding the November 2, 1987, drug screening exhibit the reasonable cause required to substantiate the Commission's request of a urine sample from Carrelli. Accordingly, we affirm the district court's determination that this search was conducted constitutionally.

### III.

■ Carrelli next argues that the district court improperly applied the doctrine of qualified immunity to the Commission officials who administer the Human Drug Abuse Regulations. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

---

**11.** Furthermore, an official's decision to act is subject to administrative review. *See* Ohio Ad-

min.Code, sec. 3769–8–09.

The invocation of the qualified immunity doctrine establishes "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 521, 105 S.Ct. 2806, 2812, 86 L.Ed.2d 411 (1985) (emphasis in original).

We agree with the district court's application of qualified immunity to these facts. Neither the United States Supreme Court, the United States Courts of Appeal, nor Ohio's highest court, had discussed the propriety of administrative drug testing upon *reasonable cause* in November of 1987.[12] The United States Supreme Court pronouncements in *Skinner* and *Von Raab* came subsequent to the test which gave rise to this appeal. Furthermore, as noted above, those opinions do not speak directly to the constitutionality of reasonable cause testing. This clearly indicates the unsettled nature of the law in 1986 and 1987 when Carrelli submitted to the Commission's drug screening procedure. According to the dictates of *Harlow v. Fitzgerald* and *Anderson v. Creighton,* the Commission officials are entitled to qualified immunity from monetary damages in this suit.

## IV.

The Commission argues on cross appeal that the district court improperly enjoined the publication procedures followed by the Commission. The district court held that the Commission violated the privacy interests of Carrelli by repeated publication of the July 1986 positive test results. The district court reasoned: "Publication of positive test results may humiliate the individual and unnecessarily brand him as a drug abuser. Further, publication of many positive test results casts a dispersion (sic) on the reputation of the horse racing industry." The district court then effectively enjoined all "unnecessary publication of positive test results" by ordering the Com-

mission to "amend its human drug testing rules." We reverse this holding and set aside the injunction.

■ The Ohio Revised Code provides that the Commission's adjudication proceedings are to be open to the public. *See* Ohio Rev.Code § 121.22.[13] Because these meetings are generally public, any person or entity has access to the recorded minutes of such proceedings. *See* Ohio Rev. Code §§ 121.22(C) and 149.43(B). In response to questions at oral argument, appellate counsel for the Commission stated that it is the practice of the Commission to publish test results only in conjunction with an adjudicatory proceeding. The Ohio State Racing Commission issues a press release to the media that summarizes the decisions that it renders. This Ohio framework comports with the established common law right of access to public records. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." (footnotes omitted)). *See also, United States v. Beckham,* 789 F.2d 401 (6th Cir.1986). A licensee of the Commission thus subjects his license to the above adjudication proceedings.

The United States Supreme Court has long recognized the existence of an individual's right to privacy. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). As we noted above, an individual does have a privacy interest in the information in his urine. *See generally, Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, (1989) and *Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). *See also, Whalen v. Roe,* 429 U.S. 589, 599–600,

---

**12.** In *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1987), the Third Circuit upheld the regulation which permitted the New Jersey Racing Commission to continue to administer *random* breathalyzer, and urine testing to any official, jockey, trainer, or groom in order to detect alcohol or drug consumption.

**13.** Ohio Rev.Code § 121.22(A) reads:

This section shall be liberally construed to require public officials to take official action and to conduct all deliberation upon official business only in open meetings, unless the subject matter is specifically excepted by law.

97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (a person has an "individual interest in avoiding disclosure of personal matters...."). However, a positive test result indicates noncompliance with the rules and regulations of the Ohio State Racing Commission. This violation of Commission rules is analogous to the reported violation of a criminal statute which ultimately becomes a matter of public record. *See e.g., Scheetz v. The Morning Call, Inc.*, 946 F.2d 202, 207 (3rd Cir.1991) (Information contained in a police report is not protected by the confidentiality branch of the constitutional right of privacy.)

Though the contours of constitutional confidentiality are murky, the positive test result, information contained in the urine, is not "private" in the constitutional sense. *See Scheetz*, 946 F.2d at 207 n. 5. This constitutionally acquired information is not information "that the disclosing person [can reasonably expect] to remain private." *Id.* at 207. Moreover, Carrelli had a lessened expectation of privacy as a member of the racing profession due to its heavy regulation. Furthermore, publication and dissemination of this quasi-judicial information within the industry must take place to ensure that the regulations are enforced; that imposed fines are collected; that suspensions of licenses are effective; and that notification to other states of licensees not in good standing is effectuated.

The Commission followed its normal practice of having a public hearing when adjudicating the status of a licensee. No evidence has been presented to show that Carrelli's positive test result was unnecessarily published. The facts tend to indicate that publication of Carrelli's test results occurred in connection with the Commission's repeated adjudication of Carrelli's licensing status. The disseminated information has a stigma attached to it that negatively affects Carrelli; but, by necessity, it contained the reason for the adjudicatory proceeding at issue, and the ultimate disposition of the license.

The appellate record establishes that the Commission's publication procedures did not invade Carrelli's constitutionally pro-

tected privacy interests. Accordingly, we countermand the district court's order to amend the publication procedures and vacate the injunction.

V.

For the foregoing reasons, we AFFIRM in large part, and REVERSE in part, the United States District Court order of August 8, 1990, from the Southern District of Ohio.