The Honorable Jimmy Jeffress State Representative P.O. Box 1695 Crossett, AR 71635-1695
Dear Representative Jeffress:
You have requested an Attorney General opinion concerning the adoption of a drug-testing policy for Ashley County employees. You suggest that the help of this Office is needed in drafting an ordinance for the Ashley County Quorum Court to enact.
With regard to Ashley County's situation, you have presented the following questions:
(1) What procedures would be used?
 (2) The County would want to test only the employees of the seven elected county officials (i.e., county judge, county clerk, etc.). Also, is it legally possible to test the elected officials?
 (3) What would be the standard procedure on re-testing an employee if the random test is found positive for drug use?
(4) How would a county go about random drug testing?
RESPONSE
I must note, as an initial matter, that your questions appear to seek legal advice, as opposed to a legal opinion. This Office does not represent individual counties and cannot, therefore, provide advice to a particular county on legal matters. I will, to the extent possible, in response to your request, however, opine upon the relevant legal principles surrounding your questions. Recognize, however, that any advice provided a particular county must come from the county attorney or the person to whom the county normally looks for legal advice.
Question 1 — What procedures would be used?
Your first question does not seek a legal opinion, but rather, asks this Office to outline procedures to use in drug testing employees. As stated above, I cannot provide this kind of advice to a county. This question should be directed to the county attorney. I can, however, discuss relevant court decisions regarding such procedures.
Before specific questions regarding types of procedures can be answered, the threshold question of whether Ashley County can constitutionally require its employees to submit to random drug tests first must be answered. For the reasons that follow, it is my opinion that the answer to that question will depend on several factual issues, including the nature and extent of the employees' duties, the methods by which employees are to be tested, and the County's reasons for testing its employees. From the information supplied in your opinion request, I cannot state conclusively whether the necessary facts exist to render an employee-testing program constitutional. However, I will set out the relevant and current law in this area. Many of these issues are discussed in two prior Attorney General Opinions on the subject of drug testing of public employees, Opinion Nos. 90-186 and 91-151, copies of which are enclosed for your review. The legal framework explained in those opinions, however, was altered somewhat by the United States Supreme Court's recent decision in Chandler v. Miller, 520 U.S. 305 (1997), which is discussed below.
The Fourth Amendment to the Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const., amend. IV. The Supreme Court has held that drug-testing requirements imposed by law and enforced by government officials are searches within the meaning of the Fourth Amendment and therefore must satisfy its reasonableness requirement. See Skinner v. Railway LaborExecutives' Ass'n, 489 U.S. 602, 617 (1989); see also National TreasuryEmployees Union v. Von Raab, 489 U.S. 656, 665 (1989).
To be reasonable under the Fourth Amendment, a search ordinarily must be accomplished pursuant to a judicial warrant issued upon probable cause.Skinner, 489 U.S. at 619. However, the Supreme Court has recognized exceptions to that general rule "when `special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" Id. (citations omitted). "When such `special needs' — concerns other than crime detection — are alleged in justification of aFourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 520 U.S. at 314. If the government shows a special need, courts then must determine whether the privacy interests implicated by the search are minimal and whether an important governmental interest furthered by the search would be placed in jeopardy by a requirement of individualized suspicion of illegal drug use as opposed to a random search. Id.
Thus, a public employer has to make two showings in order for any drug-testing policy that it enacts to be consistent with theFourth Amendment: 1) a preliminary showing that drug tests of employees are justified by a "special need" and 2) a demonstration that an important interest advanced by drug tests outweighs employee privacy interests and would be jeopardized if employees could be tested only upon suspicion of actual drug usage. A public employer's ability to make those showings will depend on several factual issues, as explained more fully below.
In Chandler, which involved a challenge to a Georgia statute requiring candidates for state offices to certify that they had passed a drug test, the Supreme Court stated that the "special need for drug testing must be substantial — important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress theFourth Amendment's normal requirement of individualized suspicion."520 U.S. at 318. The special need asserted in support of the Georgia statute was that "the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." Id. The Court, however, held that Georgia's justification for its statute did not rise to the level of a special need. In doing so, the Court pointed out that Georgia had failed to prove that its concerns about drug use by state officials were real and not "simply hypothetical. . . ." Id. at 319. The Court noted that Georgia had conceded that there was no evidence of a demonstrated problem of drug abuse among state officials. Id. In contrast, the Supreme Court upheld drug-testing programs in Skinner and Vernonia Sch. Dist. 47J v. Acton,515 U.S. 646 (1995), in part because the programs' proponents presented specific evidence of drug use among the persons to whom the testing requirements applied — railroad employees and school children.[1]
Another rationale advanced in support of the certification requirement challenged in Chandler was that it served to deter unlawful drug users from becoming candidates and thus stopped them from attaining high state office. The Court rejected that justification, pointing out that, because the test date was no secret, users of illegal drugs, except for those "prohibitively addicted," could abstain from drug use for a pretest period sufficient to avoid detection. Id. at 320. The Court also noted that Georgia had not shown that drug addicts were likely to be candidates for state office and had offered no reason "why ordinary law enforcement methods would not suffice to apprehend such addicted individuals, should they appear in the limelight of a public stage." Id.
Applying the Chandler "special need" analysis, the U.S. Court of Appeals for the Tenth Circuit recently invalidated a drug-testing policy that applied to mechanics employed by the Solid Waste Department of the City of Albuquerque. The Tenth Circuit held that Albuquerque failed to satisfy the special-need requirement because its testing policy lacked "a real capacity to address drug use in the workplace." 19 Solid Waste Dep'tMechanics v. City of Albuquerque, 156 F.3d 1068, 1074 (10th Cir. 1998). According to the Tenth Circuit, the policy was inadequate because the manner in which the tests were scheduled allowed the mechanics to know well in advance when they would have to produce specimens. Id. Thus, the mechanics could avoid detection by detoxifying their systems prior to the tests. Id. The court also pointed out that the infrequency of the tests, which occurred only once every four years, would not further the detection of drug use. Id. Thus, the court concluded that the policy was not well designed to detect drug use among employees and lacked a deterrent effect. Id.
Assuming a public employer can demonstrate a special need for any drug-testing policy that it adopts, it also will have to show that the privacy interests implicated by the tests are minimal and that an important governmental interest furthered by the tests would be jeopardized by a requirement of individualized suspicion. Factors that courts generally consider in weighing employees' privacy interests against the government's interest in drug testing include the nature of the privacy interest upon which the search intrudes, the character of the intrusion, and the immediacy of the government concern and the efficacy of the search for meeting it. Acton, 515 U.S. at 654-60.
The nature of the privacy interest upon which the search intrudes generally depends on an employee's expectation of privacy in the workplace. Courts have recognized that the nature of an employee's work and the safety concerns associated with it can diminish the employee's expectations of privacy. In Von Raab, for example, the Supreme Court held that Customs employees who were directly involved in the interdiction of illegal drugs or who were required to carry firearms in the line of duty had a diminished expectation of privacy because of the sensitive nature of their duties. 489 U.S. at 672. Employment in a highly regulated industry also has been found to reduce an employee's expectation of privacy. See Skinner, 489 U.S. at 627 (railroad employees' privacy expectations diminished because industry pervasively regulated to ensure safety); Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361,384 (6th Cir. 1998) (teachers' expectation of privacy reduced because of employment in highly regulated industry); Wilcher v. City of Wilmington,139 F.3d 366, 374-75 (3d Cir. 1998) (fire fighters have diminished expectation of privacy).
The "character of the intrusion" relates to the method by which a person is tested for drugs. The Supreme Court has recognized that the intrusions occasioned by blood and breath tests are not significant. Skinner,489 U.S. at 625-26. However, the Court also has noted that urine tests pose a more difficult question because the procedures for collecting the necessary samples intrude upon "an excretory function traditionally shielded by great privacy. . . ." Id. at 626. Thus, courts generally have favored testing programs in which there is minimal observation while the sample is produced and in which the sample is tested only for drugs and not for the presence of other medical conditions. See, e.g., Acton,515 U.S. at 658.
The immediacy of the government concern and the efficacy of the search for meeting that concern focus on the government's interest in testing and whether the test actually will accomplish that interest. The government interest in testing must be "important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy."Acton, 515 U.S. at 661. Examples of government interests that courts have recognized as important enough to warrant testing include deterring drug use by school children, Acton, 515 U.S. at 661; insuring the fitness of Customs' officials to interdict drugs and handle firearms, Von Raab,489 U.S. at 670-71; preventing railway accidents, Skinner, 489 U.S. at 620; insuring that school teachers perform their jobs unimpaired, Knox Cty.,158 F.3d at 384; preventing drivers of commercial motor vehicles from using illegal drugs while driving, International Bhd. of Teamsters v.Dep't of Trans., 932 F.2d 1292, 1304 (9th Cir. 1991); insuring the safe operation of public transportation systems, Tanks v. Greater ClevelandRegional Transit Auth., 930 F.2d 475, 479-80 (6th Cir. 1991); and insuring that police officers and fire fighters perform their duties free from impairment by illegal drugs, Penny v. Kennedy, 915 F.2d 1065, 1067
(6th Cir. 1990).
In sum, in order for a drug-testing policy that it enacts to pass constitutional muster, a public employer must demonstrate that there is a special need for drug testing and that the employer's interest in drug testing outweighs the privacy interests of its employees and elected officials. The employer's ability to satisfy those requirements will depend on the resolution of the factual issues identified above.
Question 2 — The County would want to test only the employees of theseven elected county officials (i.e., county judge, county clerk, etc.).Also, is it legally possible to test the elected officials?
See Response to Question 1. Any drug-testing policy that Ashley County adopts will have to satisfy the legal requirements set out above. With regard to the testing of elected officials, the County will have to demonstrate special needs for the drug testing that are more persuasive than those rejected by the Supreme Court in Chandler.
Question 3 — What would be the standard procedure on re-testing anemployee if the random test is found positive for drug use?
My review of cases in this area did not reveal a standard procedure for retesting of employees in the event of a positive result on a random drug test, and the Supreme Court has not addressed this issue. However, many of the testing policies reviewed by the courts have contained provisions permitting employees to take a second test to confirm the results of the first test. Again, any policy in this regard should be developed with the advice of the County's attorney.
Question 4 — How would a county go about random drug testing?
Again, this is a question to be decided by the County, after seeking the advice of its county attorney.
Assistant Attorney General Kelly Terry prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:KT/cyh
Enclosures
[1] The Court also held in Skinner that the government's interest in regulating the conduct of railroad employees to ensure safety constituted a special need. 489 U.S. at 620.